IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 41105

| | | |
|---|---|---|
| TIMOTHY ALAN DUNLAP, | ) | |
| | ) | Boise, February 2015 Term |
| Petitioner-Appellant, | ) | |
| | ) | 2015 Opinion No. 103 |
| v. | ) | |
| | ) | Filed: November 2, 2015 |
| STATE OF IDAHO, | ) | |
| | ) | Stephen Kenyon, Clerk |
| Respondent. | ) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Caribou County.  Hon. Mitchell W. Brown, District Judge.

District court summary dismissal of successive petition for post-conviction relief, affirmed.

Federal Defender Services of Idaho, Boise, for appellant.  Bruce D. Livingston argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.  LaMont Anderson argued.

HORTON, Justice.

This is an appeal from the district court in Caribou County, which summarily dismissed Timothy Dunlap's successive petition for post-conviction relief. Dunlap raised several substantive claims for post-conviction relief. For each substantive claim, he advanced a corresponding claim of ineffective assistance of appellate counsel. We affirm the district court's summary dismissal of Dunlap's successive petition for post-conviction relief.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This is the sixth appeal considered by this Court following Dunlap's plea of guilty to first-degree murder. This Court repeated the factual and procedural background of this case most recently in *State v. Dunlap*, 155 Idaho 345, 357–58, 313 P.3d 1, 13–14 (2013) (*Dunlap V*), as follows:

> On October 16, 1991, Dunlap entered and robbed the Security State Bank in Soda Springs, Idaho. Dunlap entered the bank, stood within a few feet of bank teller Tonya Crane, and ordered her to give him all of her money. Without

hesitation, Tonya Crane did so. Dunlap immediately and calmly pulled the trigger of his sawed-off shotgun, which was less than two feet from Tonya Crane's chest, literally blowing her out of her shoes. Police officers responded immediately. When the officers arrived at the bank, Tonya Crane had no pulse. When taken to the hospital she was pronounced dead on arrival.

Dunlap fled the scene, but subsequently surrendered to police. After being given his *Miranda* rights, Dunlap confessed to the murder and to a murder that occurred ten days before in Ohio. The following day, Dunlap again confessed and explained how he planned and completed both murders. Dunlap was charged with first-degree murder and robbery.

Within days of his arrest, Dunlap arranged to be interviewed by Marilyn Young, Associate Editor of the Albany New Tribune in Indiana. During the interviews Dunlap explained to Young how he murdered his girlfriend in Ohio with a crossbow and then traveled west where he subsequently planned to rob the Soda Springs' bank. Dunlap described the bank robbery and Tonya Crane's murder to the editor.

In Idaho on December 30, 1991, Dunlap pled guilty to first-degree murder for shooting Tonya Crane during the course of a robbery. "In the agreement, the State dropped the robbery and use of a firearm in the commission of a robbery charges, and Dunlap pled guilty to first degree murder and use of a firearm in the commission of a murder." *State v. Dunlap,* 125 Idaho 530, 531, 873 P.2d 784, 785 (1993) (*Dunlap I*). The plea agreement allowed the State to seek the death penalty. *Id.*

. . .

During the plea colloquy the court questioned Dunlap and his attorneys about Dunlap's mental history and whether it would have any impact on his ability to plead guilty. [The district court then reviewed medical records Dunlap provided related to his mental health.] . . . The district court judge continued with the hearing, but informed the parties he would make his decision about accepting the plea after he had a chance to review the documents. After reviewing the records, the court accepted Dunlap's plea.

. . .

After the aggravation-mitigation hearing the district court imposed the death penalty. Dunlap appealed his conviction and sentence, but this Court affirmed both. *Id.*

On May 12, 1994, Dunlap filed a petition for post-conviction relief. The district court dismissed the petition because it was not filed within forty-two days of entry of judgment. This Court reversed the district court's decision and remanded Dunlap's case for further proceedings. *Dunlap v. State,* 131 Idaho 576, 961 P.2d 1179 (1998) (*Dunlap II*).

Prior to the commencement of the evidentiary hearing, the State conceded that error occurred during Dunlap's sentencing proceeding and he would have to be resentenced. On January 11, 2002, based on the State's concession, the district court ordered a new sentencing hearing be held, but denied Dunlap's guilt-phase post-conviction relief. Dunlap timely appealed from the denial of the post-conviction application.

(alteration in original) (quoting *Dunlap v. State*, 141 Idaho 50, 55–56, 106 P.3d 376, 381–82 (2004) (*Dunlap III*)).

In *Dunlap III*, "this Court upheld the district court's denial of Dunlap's petition for post-conviction relief and the validity of his guilty plea." *Dunlap V*, 155 Idaho at 358, 313 P.3d at 14. However, we "also recognized that in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Supreme Court held that death sentences must be imposed by a jury, not a judge, and remanded the case for resentencing by a jury." *Id.*

The resentencing proceedings began with jury selection on February 6, 2006. Each potential juror completed a twenty-seven page questionnaire prior to voir dire. The district court and counsel then conducted general voir dire before proceeding to individual voir dire. Individual voir dire was limited by the district court to five minutes per side for each juror.

The sentencing hearing was conducted between February 13 and February 22, 2006. The jury found that the State had proven three aggravating factors beyond a reasonable doubt: (1) that by the murder, or the circumstances surrounding its commission, Dunlap exhibited utter disregard for human life (utter disregard aggravator); (2) the murder was committed in the perpetration of, or attempt to perpetrate arson, rape, robbery, burglary, kidnapping, or mayhem and Dunlap had the specific intent to cause the death of a human being (specific intent aggravator); and (3) by prior conduct or conduct in the commission of the murder at hand, Dunlap exhibited a propensity to commit murder that will constitute a continuing threat to society (propensity aggravator). With respect to each individual aggravating circumstance, the jury concluded that all mitigating circumstances, when weighed against the specific individual aggravating circumstance, were not sufficiently compelling to make imposition of the death penalty unjust. On February 22, 2006, in accordance with the verdict, the district court entered a judgment sentencing Dunlap to death.

Following entry of the judgment, the State Appellate Public Defender's Office (SAPD) became Dunlap's counsel of record. On May 27, 2008, Dunlap filed a petition for post-conviction relief challenging his resentencing proceedings (the 2008 Petition). The State moved for summary dismissal of the 2008 Petition, which the district court granted on November 24, 2009. In a consolidated appeal, Dunlap challenged his sentence and the summary dismissal of his 2008 Petition (Consolidated Resentencing Appeal).

While the Consolidated Resentencing Appeal was pending, on April 7, 2011, Dunlap's new attorneys with the Capital Habeas Unit of the Federal Defender Services of Idaho filed an additional petition for post-conviction relief. In this petition, Dunlap presented several substantive claims which he had not advanced in the 2008 Petition. Dunlap further claimed ineffective assistance of appellate counsel due to the failure to present the substantive claims on appeal.

On May 21, 2012, the State moved for summary dismissal of Dunlap's latest petition for post-conviction relief. On January 25, 2013, Dunlap moved for leave to amend his petition. The district court granted Dunlap's motion and Dunlap filed his Amended Petition for Post-Conviction Relief on February 15, 2013 (the 2011 Petition or Successive Petition). The parties submitted supplemental briefing in support of and in opposition to the State's motion for summary dismissal and the district court allowed post-argument briefing on the issues raised in the Successive Petition.

The district court granted the State's motion for summary dismissal and dismissed each of Dunlap's claims for post-conviction relief. The district court concluded that Dunlap's substantive claims were not timely under Idaho Code section 19-2719, as they could have been raised in his 2008 Petition. The district court concluded that Dunlap's claims of ineffective assistance of appellate counsel regarding his 2008 Petition should be dismissed because Dunlap failed to show SAPD's performance was deficient and that Dunlap had failed to show that he was prejudiced by SAPD's performance. The district court entered its final judgment dismissing Dunlap's Successive Petition on June 24, 2013. Dunlap timely appealed.

On August 27, 2013, this Court issued its decision in the Consolidated Resentencing Appeal. *Dunlap V*, 155 Idaho 345, 313 P.3d 1. We affirmed the judgment sentencing Dunlap to death. *Id.* at 392, 313 P.3d at 48. We also affirmed in part and vacated in part the district court's summary dismissal of Dunlap's 2008 Petition. *Id.* We concluded that the district court erred in summarily dismissing Dunlap's claim of ineffective assistance of trial counsel "regarding the investigation and presentation of mitigating evidence" and his claim of constitutional violations related to the State's alleged knowledge and failure to disclose exculpatory evidence related to Dunlap's mental health. *Id.* at 388–90, 313 P.3d at 44–46. This Court remanded for an evidentiary hearing on those two issues. *Id.* at 392, 313 P.3d at 48.

## II. ANALYSIS

4

Dunlap's Successive Petition sought to have the district court consider substantive claims for post-conviction relief and for each substantive claim, a corresponding claim of ineffective assistance of appellate counsel. This opinion comprises two parts. First, we address the timeliness of the substantive claims for post-conviction relief. Because we conclude Dunlap's substantive claims were not pursued in a timely manner, we will address the merits of these claims in the second part of this opinion, where we consider the corresponding claims of ineffective assistance of appellate counsel.

## A. DUNLAP'S SUBSTANTIVE CLAIMS

### 1. Standard of Review

"Whether a successive petition for post-conviction relief was properly dismissed pursuant to I.C. § 19-2719 is a question of law. This Court reviews questions of law de novo." *Fields v. State*, 154 Idaho 347, 349, 298 P.3d 241, 243 (2013) (*Fields V*) (quoting *Pizzuto v. State*, 134 Idaho 793, 795, 10 P.3d 742, 744 (2000) (*Pizzuto III*)). When reviewing a dismissal based on Idaho Code section 19-2719, "the proper standard of review this Court should utilize is to directly address the motion, determine whether or not the requirements of section 19-2719 have been met, and rule accordingly." *Stuart v. State*, 149 Idaho 35, 40, 232 P.3d 813, 818 (2010) (quoting *Hairston v. State*, 144 Idaho 51, 55, 156 P.3d 552, 556 (2007)).

### 2. Dunlap's substantive claims are barred by Idaho Code section 19-2719.

Dunlap asserted seventeen substantive claims in his Successive Petition. The district court granted the State's Motion for Summary Dismissal for each substantive claim as untimely based on Idaho Code section 19-2719. The district court concluded that Dunlap's failure to raise these substantive claims in his 2008 Petition was not excused because the issues were known or reasonably could have been known at that time and, even if the substantive issues were not known at the time of his 2008 Petition, they were not raised within a reasonable time after they became known.

On appeal, Dunlap contends that four of his substantive claims were erroneously dismissed. He argues: (1) Jury Instruction (J.I.) 11 was vague and ambiguous and therefore, unconstitutional; (2) J.I. 14 improperly instructed the jury and violated the ex post facto and due process clauses of the Idaho and U.S. Constitutions; (3) Preliminary Instruction P-3 was unconstitutional; and (4) trial counsel's inadequate voir dire amounted to ineffective assistance of trial counsel and resulted in a violation of Dunlap's right to an impartial jury. Dunlap asserts

that he was unable to raise these claims because this Court limited SAPD's opening briefing in Dunlap's Consolidated Resentencing Appeal to 100 pages.

"Post-conviction proceedings are generally controlled by the Uniform Post–Conviction Procedure Act (UPCPA)," at Idaho Code sections 19-4901 to 4911. *Pizzuto v. State*, 149 Idaho 155, 160, 233 P.3d 86, 91 (2010) (*Pizzuto V*). However, "Idaho Code Section 19-2719 provides a series of procedural requirements for post-conviction petitions in capital cases" and "[t]hese provisions supersede the UPCPA to the extent that any conflict exists." *Stuart*, 149 Idaho at 41, 232 P.3d at 819.

The purpose of Idaho Code section "19-2719 is to eliminate unnecessary delay in carrying out a valid death sentence," *Rhoades v. State*, 135 Idaho 299, 301, 17 P.3d 243, 245 (2000), by giving the claimant for post-conviction relief "one opportunity to raise all challenges to the conviction and sentence." *Dunlap III*, 141 Idaho 50, 57, 106 P.3d 376, 383 (2004). Under Idaho Code section 19-2719(3), "within forty-two days after the judgment imposing the punishment of death, 'the defendant must file any legal or factual challenge to the sentence or conviction that is known or reasonably should be known.' " *Fields v. State*, 151 Idaho 18, 23, 253 P.3d 692, 697 (2011) (*Fields IV*) (quoting Idaho Code § 19-2719(5)). Idaho Code section 19-2719 provides that if a defendant fails to timely apply for post-conviction relief, the defendant has "waived such claims for relief as were known, or reasonably should have been known" and "[t]he courts of Idaho shall have no power to consider any such claims for relief as have been so waived . . . ." I.C. §§ 19-2719(3), (5); *see Pizzuto III*, 134 Idaho at 795, 10 P.3d at 744.

There is one exception: "a successive post-conviction petition may be heard . . . for issues that were not known or could not reasonably have been known" within forty-two days of the judgment. I.C. § 19-2719(5)(a). However, even in such cases, this Court requires the claims to be asserted within a reasonable time after they are known or reasonably could have been known. *Stuart*, 149 Idaho at 41, 232 P.3d at 819. In *Pizzuto v. State*, 146 Idaho 720, 727, 202 P.3d 642, 649 (2008) (*Pizzuto IV*), this Court concluded:

> [A] reasonable time for filing a successive petition for post-conviction relief is forty-two days after the petitioner knew or reasonably should have known of the claim, unless the petitioner shows that there were extraordinary circumstances that prevented him or her from filing the claim within that time period.

"Idaho Code § 19-2719 places a heightened burden on petitioners to make a prima facie showing that the issues raised after the forty-two day time period were not known or could not

reasonably have been known." *Pizzuto V*, 149 Idaho at 160, 233 P.3d at 91. Idaho Code section 19-2719 dictates that a successive post-conviction petition:

> shall not be considered unless the applicant shows the existence of such issues by (i) a precise statement of the issue or issues asserted together with (ii) material facts stated under oath or affirmation by credible persons with first hand knowledge that would support the issue or issues asserted. A pleading that fails to make a showing of excepted issues supported by material facts, or which is not credible, must be summarily dismissed.

I.C. § 19-2719(5)(a); *see also* I.C. § 19-2719(11) (any successive post-conviction petition that does not comply with Idaho Code section 19-2719(5) "shall be dismissed summarily").

Here, the judgment imposing the death sentence was filed on February 22, 2006. Dunlap's initial version of the Successive Petition was filed on April 7, 2011. Thus, Dunlap was required to meet the heightened burden imposed by Idaho Code section 19-2719. Because Dunlap made no argument or showing that his claims of error regarding the jury instructions and voir dire were not known or could not have been known within forty-two days of the 2006 judgment, Dunlap is deemed to have waived each substantive claim for relief by operation of Idaho Code section 19-2719(5).

Dunlap asserts that that he should be excused from failing to raise these claims within the time limits of Idaho Code section 19-2719 due to the page limit imposed by this Court in Dunlap's Consolidated Resentencing Appeal. Dunlap argues the page limit violated his due process rights under the Fourteenth Amendment because it impeded his ability to present all of his claims to this Court and consequently limited his ability to seek federal habeas corpus relief on the omitted claims. This Court's order imposing the page limit was entered on March 22, 2011. Dunlap did not raise the page limit issue in his Successive Petition. Instead, the issue was presented only as a response to the State's motion for summary dismissal. As Dunlap did not properly raise this due process claim in a timely fashion, we will not consider this issue on appeal.

"Any remedy available by post-conviction procedure, habeas corpus or any other provision of state law must be pursued according to the procedures set forth in" Idaho Code section 19-2719 and within the time limitations of Idaho Code section 19-2719(3). I.C. § 19-2719(4). Indeed, the courts of Idaho have no power to consider claims for relief "[i]f the defendant fails to apply for relief as provided" in Idaho Code section 19-2719. I.C. § 19-2719(5). Thus, all claims for relief must be made by way of a petition for post-conviction relief. As this

Court explained in *McKinney*, when the defendant fails to raise an issue in the petition or in an amended petition, that issue is not raised before the district court and this Court will not consider the issue on appeal. *McKinney v. State*, 133 Idaho 695, 708, 992 P.2d 144, 157 (1999); *see also Cowger v. State*, 132 Idaho 681, 686–87, 978 P.2d 241, 246–47 (Ct. App. 1999).

This Court has consistently maintained that "the petitioner must raise the newly discovered issues 'within a reasonable time.' " *Fields v. State*, 155 Idaho 532, 535, 314 P.3d 587, 590 (2013) (*Fields VI*) (quoting *Fields V*, 154 Idaho 347, 350, 233 P.3d 241, 244 (2013)); *see Stuart*, 149 Idaho at 41, 232 P.3d at 819. Again, a reasonable time is forty-two days "after the petitioner knew or reasonably should have known of the claim, unless the petitioner shows that there were extraordinary circumstances that prevent him or her from filing" within that time. *Pizzuto V*, 146 Idaho at 727, 202 P.3d at 649.

In the Consolidated Resentencing Appeal, Dunlap sought permission to file an overlength brief of 221 pages. On March 22, 2011, this Court granted Dunlap leave to file a 100 page brief. Dunlap renewed his motion and this Court permitted him to file a brief 114 pages long.

Dunlap filed the initial version of his Successive Petition on April 7, 2011, well after he had notice of his claim based upon the page limit. Dunlap did not raise this issue until November 30, 2012, when he filed his response to the State's motion for summary dismissal. Even though the State contended that the claim was improper because it was not raised in his petition for post-conviction relief, the Successive Petition filed on February 15, 2013, did not advance a claim based upon the page limit. Thus, at no point did Dunlap present a precise statement of the issue together with material facts in a petition for post-conviction relief as required by Idaho Code section 19-2719, and as such, it cannot be considered. *See* I.C. § 19-2719(5)(a).

Further, Dunlap did not raise this issue within a reasonable time. Dunlap knew of the facts supporting this claim in March of 2011 and took no action until November of 2012. Dunlap has not identified any extraordinary circumstance which prevented him from filing this claim within a reasonable time. Because the requirements of Idaho Code section 19-2719 have not been met, we conclude that the district court properly dismissed all of Dunlap's substantive claims. As a result, we will only address Dunlap's claims of ineffective assistance of appellate counsel.[1]

---

[1] The district court concluded that the earliest possible time that Dunlap could have known of his claims for ineffective assistance of appellate counsel was upon the filing of his first brief on March 22, 2011. The district court

**B. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL**

Dunlap challenges the district court's summary dismissal of his four claims for ineffective assistance of appellate counsel. Three claims involve jury instructions and one claim involves *voir dire*, which contains several sub-issues. For each of these claims, Dunlap argues that the substantive claim is stronger than the claims presented by SAPD in the Consolidated Resentencing Appeal and that SAPD was ineffective for failing to raise these claims. We conclude that the district court properly granted summary dismissal for each claim of ineffective assistance of appellate counsel as explained below.

**1. Standard of Review: Summary Dismissal of Application for Post-Conviction Relief**

"Proceedings for post-conviction relief are civil in nature, rather than criminal, and the applicant must therefore prove the allegations in the request for relief by a preponderance of the evidence." *Dunlap V*, 155 Idaho 345, 361, 313 P.3d 1, 17 (2013) (citing *State v. Payne*, 146 Idaho 548, 560, 199 P.3d 123, 135 (2008)). However, an application for post-conviction relief differs from an ordinary civil action complaint because it must contain more than a short and plain statement of the claim that would be sufficient for a complaint under I.R.C.P. 8(a)(1). *State v. Yakovac*, 145 Idaho 437, 443–44, 180 P.3d 476, 482–83 (2008). An application for post-conviction relief "must present or be accompanied by admissible evidence supporting its allegations, or the application is subject to dismissal." *Id.* at 444, 180 P.3d at 483 (citing I.C. § 19-4903). In addition:

> Idaho Code § 19-4906 authorizes summary dismissal of an application for post-conviction relief, either pursuant to motion of a party or upon the trial court's own initiative. Summary dismissal of an application is the procedural equivalent of summary judgment under I.R.C.P. 56. Summary dismissal is permissible only when the applicant's evidence has raised no genuine issue of material fact that, if resolved in the applicant's favor, would entitle the applicant to the relief requested.

---

found that Dunlap's initial version of his Successive Petition was timely filed on April 7, 2011. We agree with the analysis. *See State v. Paz*, 123 Idaho 758, 760, 852 P.2d 1355, 1357 (1993) (the basis of claims for ineffective assistance of appellate counsel are known at the time the brief is filed).We note, however, the amendment of Idaho Code section 19-2719, which permits additional time to file claims for ineffective assistance of appellate counsel. 2015 Idaho Sess. L. ch. 245, § 1, p. 1040. As amended, Idaho Code section 19-2719(3) now provides:

> Within forty-two (42) days of the filing of the judgment imposing the punishment of death, and before the death warrant is filed, the defendant must file any legal or factual challenge to the sentence or conviction that is known or reasonably should be known. *The defendant must file any claims of ineffective assistance of appellate counsel within forty-two (42) days of the Idaho supreme court issuing the final remittitur in the unified appeal from which no further proceedings except issuance of a death warrant are ordered.*

*Payne*, 146 Idaho at 561, 199 P.3d at 136; *see also Charboneau v. State*, 140 Idaho 789, 792, 102 P.3d 1108, 1111 (2004) (*Charboneau III*).

"In determining whether a motion for summary disposition is properly granted," this Court applies the same standard as the trial court and "must review the facts in a light most favorable to the petitioner, and determine whether they would entitle petitioner to relief if accepted as true." *Id*. at 793, 102 P.3d at 1112 (quoting *Sakyhamchone v. State*, 127 Idaho 319, 321, 900 P.2d 795, 797 (1995)). "When a genuine issue of material fact is shown to exist, an evidentiary hearing must be conducted." *Dunlap V*, 155 Idaho at 361, 313 P.3d at 17.

"However, summary dismissal may be appropriate even where the State does not controvert the applicant's evidence because the court is not required to accept either the applicant's mere conclusory allegations, unsupported by admissible evidence, or the applicant's conclusions of law." *Payne*, 146 Idaho at 561, 199 P.3d at 136. Thus, allegations contained in the application are insufficient for the granting of relief if: (1) the petitioner has not presented evidence making a prima facie case as to each essential element of the claims, *Berg v. State*, 131 Idaho 517, 518, 960 P.2d 738, 739 (1998); (2) the claims are clearly disproved by the record of the original proceedings, *Charboneau v. State*, 144 Idaho 900, 903, 174 P.3d 870, 873 (2007) (*Charboneau IV*); or (3) the claims do not justify relief as a matter of law. *Id*.

## 2. Standard of Review: Fundamental Error

"If the alleged error was not followed by a contemporaneous objection, it shall only be reviewed . . . under Idaho's fundamental error doctrine." *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010).

> [I]n cases of unobjected to fundamental error: (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*Id.* at 226, 245 P.3d at 978.

## 3. Ineffective Assistance of Appellate Counsel

"The right to counsel in criminal actions brought by the state of Idaho is guaranteed by the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Idaho State Constitution." *Murray v. State*, 156 Idaho 159, 164, 321 P.3d 709, 714 (2014) (quoting

*Booth v. State*, 151 Idaho 612, 617, 262 P.3d 255, 260 (2011)). "[T]he right to counsel is the right to the effective assistance of counsel." *Id.* (alteration in original) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). "[D]efendants have a right to effective assistance of counsel on appeal . . . ." *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1385 (2012).

This Court analyzes state and federal constitutional claims for ineffective assistance of counsel under the two-prong test set forth in *Strickland*, 466 U.S. at 687. *See Johnson v. State*, 156 Idaho 7, 10–11, 319 P.3d 491, 494–95 (2014). Additionally, we use the same test to evaluate ineffective assistance of appellate counsel on direct appeal as we use to evaluate ineffective assistance of trial counsel. *See Mitchell v. State*, 132 Idaho 274, 277, 971 P.2d 727, 730 (1998).

To prevail under *Strickland*, the petitioner must show: (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Thus, "[i]n order to survive a motion for summary dismissal, post-conviction relief claims based upon ineffective assistance of counsel must establish 'the existence of material issues of fact as to' " both *Strickland* prongs. *Dunlap V*, 155 Idaho at 383, 313 P.3d at 39 (quoting *Kelly v. State*, 149 Idaho 517, 522, 236 P.3d 1277, 1282 (2010)).

To prove counsel's performance was deficient, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see Dunlap V*, 155 Idaho at 383, 313 P.2d at 39; *Booth*, 151 Idaho at 617, 262 P.3d at 260. "In doing so, the defendant must overcome a strong presumption that counsel was competent and diligent in his or her representation of the defendant," *Booth*, 151 Idaho at 618, 262 P.3d at 261, and that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "To overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.' " *Cullen v. Pinholster*, 563 U.S. 170, ___, 131 S. Ct. 1388, 1403 (2011) (alteration in original) (quoting *Strickland*, 466 U.S. at 688). "[S]trategic and tactical decisions will not be second guessed or serve as a basis for post-conviction relief under a claim of ineffective assistance of counsel unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law or other shortcomings capable of objective review." *Dunlap V*, 155 Idaho at 386, 313 P.3d at 42 (alteration in original) (quoting *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000)). Importantly, "[a] fair assessment of attorney performance requires that every effort be made to

eliminate the distorting effects of hindsight," and counsel's conduct must be evaluated "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

To demonstrate deficient performance of appellate counsel for failure to raise a claim on appeal, the defendant must show that counsel made an objectively unreasonable decision to omit the claim. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000); *see also Moore v. Mitchell*, 708 F.3d 760, 792 (6th Cir. 2013). Courts have recognized that appellate counsel may fail to raise an issue on appeal because counsel "foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989); *see Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). Appellate counsel is not deficient for using reasonable professional judgment in deciding the most promising issues for appellate review and counsel is not required to raise issues which are reasonably considered to be meritless. 24 C.J.S. *Criminal Law* § 2361 (2014). Indeed, "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Robbins*, 528 U.S. at 288 (citing *Jones*, 463 U.S. 745).

The United States Supreme Court has stated that when a claim of ineffective assistance of counsel is based on a failure to raise issues on appeal, "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). The Ninth Circuit has likewise indicated that appellate counsel's failure to raise a claim on appeal is deficient when the omitted "claim was 'clearly stronger than those presented' on appeal." *Hurles v. Ryan*, 752 F.3d 768, 783 (9th Cir. 2014) (quoting *Robbins*, 528 U.S. at 258); *see also Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) ("a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker"); *Hollon v. Kentucky*, 334 S.W.3d 431, 436 (Ky. 2010); *Mintun v. State*, 144 Idaho 656, 661, 168 P.3d 40, 45 (Ct. App. 2007).[2]

---

[2] The State cites to *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995), for the proposition that the issue not raised must be a "dead bang winner" that was "obvious from the trial record" in order to find ineffective assistance of appellate counsel. In 2001, the Tenth Circuit disavowed the use of the language "dead bang winner" to the extent it implies "requiring a showing more onerous than a reasonable probability that the omitted claim would have

12

To prove that counsel's deficient performance prejudiced the defendant, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Dunlap V*, 155 Idaho at 383, 313 P.3d at 39 (quoting *Cullen*, 563 U.S. at ___, 131 S. Ct. at 1403). "This 'requires a substantial, not just conceivable, likelihood of a different result.' " *Id.* (quoting *Cullen*, 563 U.S. at ___, 131 S. Ct. at 1403). When reviewing appellate counsel's performance, we determine whether, but for appellate counsel's errors, a reasonable probability exists that the defendant would have prevailed on appeal. *Robbins*, 528 U.S. at 285; *Hurles*, 752 F.3d at 785.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Thus, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* The United States Supreme Court has stated: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

To address the propriety of the district court's grant of summary dismissal, we look to each claim of ineffective assistance of appellate counsel to discuss the merits of the omitted claim. This evaluation informs the determination whether appellate counsel's decision to omit the claim was objectively unreasonable and whether, but for appellate counsel's failure to raise the claim, there is a reasonable probability that the result of Dunlap's direct appeal in his 2008 Consolidated Resentencing Appeal would have been different. Because we conclude that Dunlap presented no genuine issue of material fact that, if resolved in his favor, entitles him to relief for ineffective assistance of appellate counsel, we find the district court's summary dismissal of these claims to be proper.

4. **Appellate counsel was not ineffective for failing to raise the claim that the propensity aggravator instruction was unconstitutional.**

Dunlap argues that SAPD was ineffective because it failed to raise the following claim on direct appeal: that J.I. 11, regarding the propensity aggravator was unconstitutionally vague and

resulted in a reversal on appeal." *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). We decline to adopt the elevated standard advanced by the State.

ambiguous. We consider the merits of this claim to evaluate whether, if it had been raised, there is a reasonable probability that it would have prevailed on appeal, the standard by which Dunlap's claim of prejudice is judged.

At resentencing, the State alleged three aggravating circumstances. One of them was the propensity aggravator. J.I. 11 informed the jury:

> The phrase "exhibited a propensity to commit murder which will probably constitute a continuing threat to society" means conduct showing that the defendant is more likely than not to be a continuing threat to society. The state is required to prove the existence of this propensity beyond a reasonable doubt. Such finding cannot be based solely upon the fact that you found the defendant guilty of murder. In order for a person to have a propensity to commit murder, the person must be a willing, predisposed killer, a killer who tends toward destroying the life of another, one who kills with less than the normal amount of provocation. Propensity requires a proclivity, a susceptibility, and even an affinity toward committing the act of murder.

Dunlap asserts that J.I. 11 failed to adequately narrow the class of murderers eligible for the death penalty and insufficiently channeled the jurors' sentencing discretion in violation of the due process clause of the Fourteenth Amendment, along with the Fifth, Sixth, and Eight Amendments. Dunlap argues that the phrase "less than the normal amount of provocation" is ambiguous and that the phrase "one who kills with less than the normal amount of provocation" is likely understood to mean anyone who commits first-degree murder.

The State counters that, because this Court and the federal district court for the District of Idaho have previously approved the language of J.I. 11, appellate counsel was not ineffective for failing to raise this claim on appeal. Further, the State argues that even if the instruction was erroneous, the error would be harmless because the jury found two other statutory aggravating factors.

Rather than considering the claim of deficient performance by SAPD, we consider the prejudice prong under *Strickland*. To prove he was prejudiced by SAPD's failure to advance this claim on appeal, Dunlap must establish a reasonable probability that the claim would have succeeded on appeal. Because Dunlap did not object to this instruction below, had SAPD raised this issue on direct appeal, this Court could only have reviewed the argument for fundamental error. *State v. Adamcik*, 152 Idaho 445, 472–73, 272 P.3d 417, 444–45 (2012). Thus, to prevail, Dunlap would have had to establish: "(1) the alleged error violated an unwaived constitutional

right; (2) the alleged error plainly exists and (3) the alleged error was not harmless." *Id.* at 473, 272 P.3d at 445 (citing *State v. Perry*, 150 Idaho 209, 224, 245 P.3d 961, 976 (2010)).

We review jury instructions "de novo to determine 'whether, when considered as a whole, they fairly and adequately present the issues and state the applicable law.' " *Dunlap V*, 155 Idaho 345, 364, 313 P.3d 1, 20 (2013) (quoting *Adamcik*, 152 Idaho at 472, 272 P.3d at 444). Instructions must not be judged "in artificial isolation, but must be considered in the context of the instructions as a whole . . . ." *Adamcik*, 152 Idaho at 472, 272 P.3d at 444. (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

"Our capital punishment doctrine is rooted in the principle that '[t]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be . . . wantonly and . . . freakishly imposed.' " *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990) (quoting *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)). Thus, "to satisfy the Eighth and Fourteenth Amendments, a capital sentencing scheme must 'suitably direc[t] and limi[t]' the sentencer's discretion 'so as to minimize the risk of wholly arbitrary and capricious action.' " *Arave v. Creech*, 507 U.S. 463, 470 (1993) (alterations in original) (quoting *Jeffers*, 497 U.S. at 774).

To pass constitutional muster, aggravating circumstances must "apply only to a subclass of defendants convicted of murder," and "may not be unconstitutionally vague." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994). The capital sentencing scheme must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." *Arave*, 507 U.S. at 471 (quoting *Jeffers*, 497 U.S. at 774). "An Eighth Amendment claim based upon vagueness examines whether the challenged aggravating circumstance, together with any limiting instruction, adequately channels the discretion of the sentencing body in order to prevent the imposition of an arbitrary and capricious sentence." *State v. Leavitt*, 121 Idaho 4, 5, 822 P.2d 523, 524 (1991); *see also Maynard v. Cartwright*, 486 U.S. 356, 361–62 (1988); *State v. Card*, 121 Idaho 425, 434, 825 P.2d 1081, 1090 (1991). "[A]ggravating circumstances must be construed to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not." *Card*, 121 Idaho at 434–35, 825 P.2d at 1090–91 (quoting *Jeffers*, 497 U.S. at 776).

In Idaho, the propensity aggravator is found in Idaho Code section 19-2515(9), which provides a list of "statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed." The propensity aggravator provides: "The defendant, by his conduct, whether such conduct was before, during or after the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society." I.C. § 19-2515(9)(i). In *State v. Creech*, this Court upheld the propensity aggravator as constitutional and in doing so provided a narrowing interpretation:

> We would construe "propensity" to exclude, for example, a person who has no inclination to kill but in an episode of rage, such as during an emotional family or lover's quarrel, commits the offense of murder. We would doubt that most of those convicted of murder would again commit murder, and rather we construe the "propensity" language to specify that person who is a willing, predisposed killer, a killer who tends toward destroying the life of another, one who kills with less than the normal amount of provocation. We would hold that propensity assumes a proclivity, a susceptibility, and even an affinity toward committing the act of murder.

*State v. Creech*, 105 Idaho 362, 370–71, 670 P.2d 463, 471–72 (1983).

J.I. 11 was taken directly from this Court's limiting language in *Creech*. Since that time, we have upheld the constitutionality of the propensity aggravator, when combined with this limiting construction, against challenges that it is vague or that it unconstitutionally lowers the burden of proof. *Dunlap I*, 125 Idaho 530, 536, 873 P.2d 784, 790 (1993); *State v. Pizzuto*, 119 Idaho 742, 772, 810 P.2d 680, 710 (1991) *overruled on other grounds by Card*, 121 Idaho 425, 825 P.2d 1081; *State v. Sivak*, 105 Idaho 900, 905, 674 P.2d 396, 401 (1983). In *Beam v. Paskett*, 744 F. Supp. 958, 964 (D. Idaho 1990) *aff'd in part, rev'd in part on other grounds*, 966 F.2d 1563 (9th Cir. 1992), the federal district court for the District of Idaho concluded that the propensity aggravator with the limiting instruction was sufficiently narrow to channel the sentencer's discretion to focus on the future danger posed by the offender based on objective facts. *See also Creech v. Hardison*, 2010 WL 1338126 * 21 (D. Idaho 2010) (explaining that the federal district court has affirmed, no less than four times, the constitutionality of Idaho's propensity aggravator with the limiting instruction).

Although Dunlap argues that anyone convicted of first-degree murder necessarily kills with "less than the normal amount of provocation," Dunlap ignores the fact that not every first-degree murder will satisfy the standard set forth in J.I. 11. The instruction provides that a finding

of propensity to commit murder "*cannot* be based solely upon the fact that you found the defendant guilty of murder," and that "[p]ropensity *requires* a proclivity, a susceptibility, and even an affinity toward committing the act of murder." We continue to adhere to our previous decisions that the language found in J.I. 11 sufficiently directs and limits the jury's discretion by providing clear and objective standards and detailed guidance on what it means to exhibit a propensity to commit murder.

Viewing the facts in the light most favorable to Dunlap, he has failed to present an issue of material fact showing SAPD's omission of a challenge to the constitutionality of J.I. 11 prejudiced Dunlap. There is not a reasonable probability that had SAPD raised this issue on appeal the result would have been different because the argument is without merit.[3] The district court properly granted summary dismissal of Dunlap's claim that SAPD provided ineffective appellate counsel for omitting the claim that J.I. 11 was vague and ambiguous.

**5. Appellate counsel was not ineffective for failing to raise the claim that the aggravating and mitigating circumstances instruction was unconstitutional.**

Next, Dunlap argues that SAPD provided ineffective assistance of appellate counsel for failing to raise the claim on appeal that J.I. 14 and the verdict form violated the ex post facto and due process clauses of the United States Constitution. Dunlap argues that J.I. 14 and the verdict form improperly instructed the jury on the laws of sentencing by providing the language from the relevant statute as it existed at the time of Dunlap's resentencing and not as it existed at the time of his offense and guilty plea. To meet the *Strickland* prejudice prong, Dunlap must show that but for SAPD's failure to raise the issue of J.I. 14, there is a reasonable probability that the result

---

[3] Even if we were to hold otherwise and conclude that J.I. 11 fell short of constitutional standards, the error would be harmless. In Idaho, the jury must weigh *all* mitigating circumstances together against *each* aggravating circumstance individually. *State v. Hairston*, 133 Idaho 496, 510, 988 P.2d 1170, 1184 (1999).

> When such an analysis is followed, *the invalidation of one or more of the aggravating circumstances has no effect on the validity of the sentence* imposed; the [jury] has already determined that any one of the aggravating circumstances standing alone outweighs all the mitigating circumstances, thus justifying the death sentence.

*Id.* At resentencing the jury found that the State had proven three aggravating circumstances beyond a reasonable doubt: utter disregard, specific intent, and propensity. In Dunlap's Consolidated Resentencing Appeal, he challenged the propriety of both the utter disregard and specific intent aggravator. Although this Court concluded the jury instructions for the specific intent aggravator were erroneous, we found that the utter disregard aggravator was not unconstitutionally vague. *Dunlap V*, 155 Idaho at 377, 313 P.3d at 33. We affirmed the jury's determination that the State proved the utter disregard aggravator beyond a reasonable doubt. *Id.* at 365, 313 P.3d at 21. Dunlap does not challenge the utter disregard aggravator in the current appeal. Thus, even had SAPD raised the issue of J.I. 11, and even if this Court had determined that the propensity aggravator was unconstitutional, it would have no effect on the validity of the sentence imposed because the sentence of death would be valid based solely on the utter disregard aggravator.

on appeal would have been different. Once again, we address the substantive merits of the claim in order to evaluate the prejudice prong.

J.I. 14 instructed the jury on what it needed to decide in its deliberations and provided the language for the jury verdict form. J.I. 14 provided in pertinent part:

> In reaching your verdict, you must first decide whether the State has proven beyond a reasonable doubt that any of the statutory aggravating circumstances exist.
>
> . . . .
>
> If you unanimously find that the State has proven the existence of a statutory aggravating factor, then you must so indicate on the verdict form. You must also then consider whether any mitigating circumstances exist that make the imposition of the death penalty unjust.
>
> *If you find that all mitigating circumstances are sufficiently compelling to make the imposition of the death penalty unjust*, or you cannot unanimously agree on that issue, then the defendant will be sentenced to life in prison without the possibility of parole.
>
> *If you find that all mitigating circumstances do not make the imposition of the death penalty unjust, then the defendant will be sentenced to death*.

This instruction comes from the language of Idaho Code section 19-2515. As the language of the statute was amended over the years, it is helpful to recognize those changes before addressing Dunlap's claim. In 1991, at the time of Dunlap's offense and the entry of his guilty plea, Idaho Code section 19-2515(c) provided:

> Where a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless the court finds at least one (1) statutory aggravating circumstance. Where the court finds a statutory aggravating circumstance the court shall sentence the defendant to death unless the court finds that *mitigating circumstances which may be presented outweigh the gravity of any aggravating circumstance found and make imposition of death unjust*.

I.C. § 19-2515(c) (Michie 1991). In 1995, Idaho Code section 19-2515(c) was amended, in pertinent part, to provide as follows: "the court shall sentence the defendant to death unless the court finds that mitigating circumstances which may be presented ~~outweigh the gravity of any aggravating circumstance found and make imposition of~~ are sufficiently compelling that the death ~~penalty would~~ be unjust." 1995 Idaho Sess. L. ch. 140, § 1, p. 595. In 1998, Idaho Code section 19-2515(c) was amended to include the requirement that the prosecutor file notice of intent to seek the death penalty as a condition precedent to a defendant's eligibility for capital

punishment. 1998 Idaho Sess. L. ch. 96, sec. 3, p. 344. In 2003, the statute was amended to comply with the United States Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which required that a jury (unless waived) determine the existence of statutory aggravating circumstances. Following this amendment, Idaho Code section 19-2515(3) provided:

> Where a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless:
>
> . . . .
>
> (b) The jury, or the court if a jury is waived, finds beyond a reasonable doubt at least one (1) statutory aggravating circumstance. Where a statutory aggravating circumstance is found, the defendant shall be sentenced to death *unless mitigating circumstances which may be presented are found to be sufficiently compelling that the death penalty would be unjust*.

2003 Idaho Sess. L. ch. 19, § 4, p. 73.

Dunlap's argument is predicated upon the differences between Idaho Code section 19-2515(c) in 1991, at the time of his guilty plea (the 1991 law), and Idaho Code section 19-2515(3)(b) in 2006, at the time of the resentencing proceedings (the 2006 law). Dunlap asserts that the 2006 law, which provided that "the defendant shall be sentenced to death unless mitigating circumstances . . . are found to be sufficiently compelling that the death penalty would be unjust," imposed a lower burden of proof on the State than the 1991 law, which provided that the death penalty would be imposed unless the "mitigating circumstances . . . outweigh the gravity of any aggravating circumstance found and make imposition of death unjust." Dunlap argues that this violated the ex post facto and due process clauses of the state and federal constitutions. The district court granted the State's motion for summary dismissal of this claim, concluding that the 2006 law makes it easier for a jury to avoid imposing a death sentence. The district court further concluded that the amendments to Idaho Code section 19-2515 were procedural, and as such, did not place Dunlap in greater jeopardy.

Because Dunlap did not object to this instruction below, had SAPD raised this issue on direct appeal, this Court could only have reviewed the claim for fundamental error. *State v. Adamcik*, 152 Idaho 445, 472–73, 272 P.3d 417, 444–45 (2012). "We review the trial court's jury instructions de novo to determine 'whether, when considered as a whole, they fairly and adequately present the issues and state the applicable law.' " *Dunlap V*, 155 Idaho 345, 364, 313 P.3d 1, 20 (2013) (quoting *Adamcik*, 152 Idaho at 472, 272 P.3d at 444).

19

"Ex post facto laws are prohibited by article I, section 9, clause 3 of the United States Constitution and by article I, section 16 of the Idaho Constitution." *State v. Shackelford*, 150 Idaho 355, 375, 247 P.3d 582, 602 (2010). Ex post facto laws are:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Calder v. Bull*, 3 U.S. 386, 390 (1798); *see Carmell v. Texas*, 529 U.S. 513, 522 (2000); *State v. Abdullah*, 158 Idaho 386, 451, 348 P.3d 1, 66 (2015). As to the fourth category, "[t]he last six words are crucial. The relevant question is whether the law affects the quantum of evidence required to *convict . . . .*" *Carmell*, 529 U.S. at 551 (emphasis in original). Dunlap asserts that the third and fourth categories are relevant here, asserting use of the 2006 law lowered the State's burden with respect to finding and weighing aggravating and mitigating circumstances and increased the punishment by making it easier to obtain a death sentence.

"The inhibition against the passage of ex post fact laws does not extend to limit the legislative control of remedies and modes of procedure, which do not affect matters of substance." *State v. Lovelace*, 140 Idaho 53, 70, 90 P.3d 278, 295 (2003) (*Lovelace I*). "A change in law will be deemed to affect matters of substance where it increases the punishment or changes the ingredients of the offense or the ultimate facts necessary to establish guilt." *State v. Lovelace*, 140 Idaho 73, 77, 90 P.3d 298, 302 (2004) (*Lovelace II*); *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) ("A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes.");[4] *Carmell*, 529 U.S. at 530 (when the

---

[4] We note that *Schriro* concluded that the change announced in *Ring* was procedural, not substantive:

> *Ring's* holding is properly classified as procedural. *Ring* held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty." 536 U.S. at 609, 122 S.Ct. 2428. Rather, "the Sixth Amendment requires that [those circumstances] be found by a jury." *Ibid.* This holding did not alter the range of conduct Arizona law subjected to the death penalty. It could not have; it rested entirely on the Sixth Amendment's jury-trial guarantee, a provision that has nothing to do with the range of conduct a State may criminalize. Instead, *Ring* altered the range of permissible methods for determining whether a defendant's conduct is punishable by death, requiring that a jury rather than a judge find the essential facts bearing on punishment. Rules that allocate decision making authority in this fashion are prototypical procedural rules, a conclusion we have reached in numerous other contexts.

amended law changes "the quantum of evidence necessary to sustain a conviction" it is an ex post facto law which alters the legal rules of evidence)."In contrast, rules that regulate only the manner of determining the defendant's culpability are procedural." *Schriro*, 542 U.S at 353. "Hence, '[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto.' " *Abdullah*, 158 Idaho at 451, 348 P.3d at 66 (quoting *Dobbert v. Florida*, 432 U.S. 282, 293 (1977)).

This Court has previously determined that placing the burden on the defendant to prove that mitigating circumstances are "sufficiently substantial to call for leniency" does not run afoul of the constitution so long as it does not lessen the State's burden to prove the existence of aggravating circumstances. *State v. Hoffman*, 123 Idaho 638, 647, 851 P.2d 934, 943 (1993) (citing *Walton v. Arizona*, 497 U.S. 639, 650 (1990) *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002)). Indeed, a State is allowed to specify how to prove mitigating circumstances. *Walton*, 497 U.S. at 649–50.

This amendment was procedural. Under Idaho's capital sentencing law, as it stood in 1991 and in 2006, the State has the burden to prove the existence of any aggravating circumstances beyond a reasonable doubt. *See Hoffman*, 123 Idaho at 647, 851 P.2d at 943. In both 1991 and 2006, the State was required to prove at least one aggravating circumstance beyond a reasonable doubt to render the defendant eligible for capital punishment. The change from "outweigh the gravity" to "sufficiently compelling," did nothing to lessen the amount or measure of proof which was necessary for a capital sentence to be imposed.

Beyond the procedural nature of the amendment, the amendments did not disadvantage Dunlap. "It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." *Dobbert*, 432 U.S. at 294; *see State v. Johnson*, 152 Idaho 41, 44, 266 P.3d 1146, 1149 (2011) ("prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them"). Under the 1991 law, the sentencing authority needed to find that mitigating circumstances "outweigh[ed] the gravity" of an aggravating circumstance.

"Outweigh" means "to exceed in weight, value, or importance." *Webster's Third New International Dictionary* 1605 (2002). "Gravity" means "sobriety or seriousness," or "importance, or significance." *Id.* at 993. Thus, under the 1991 law, the death penalty was

---

542 U.S. at 353 (alteration in original). In *Rhoades v. State*, 149 Idaho 130, 140, 233 P.3d 61, 71 (2010) we also concluded "that *Ring* announced a new procedural rather than substantive rule."

required unless the sentencing authority found that the mitigating circumstances exceeded the seriousness of the aggravating circumstance *and* that those mitigating circumstances would make imposition of the death penalty unjust.

The 2006 law eliminated the requirement that the sentencing authority find that the mitigating circumstances "outweigh[ed] the gravity" of any aggravating circumstance and provided that the death penalty will be avoided if the sentencing authority finds the mitigating circumstances "sufficiently compelling that the death penalty would be unjust." "Sufficiently" means "to a sufficient degree" or a quantity "to meet with the demands." *Id.* at 2284–85. "Compelling" means "tending to convince or convert by or as if by forcefulness of the evidence." *Id.* at 463. Thus, under the 2006 law, the death penalty can be avoided in the event that the sentencing authority finds enough mitigating evidence to conclude that imposition of the death penalty would be unjust. Dunlap's claim that the changes between the 1991 and 2006 laws reduced the State's burden is without merit. Because we conclude there was no ex post facto violation, Dunlap was not prejudiced by SAPD's failure to raise this issue on appeal.[5]

For the foregoing reasons, we conclude the district court properly granted summary dismissal of Dunlap's claim that SAPD provided ineffective appellate counsel for failing to raise the claim that J.I. 14 violated the ex post facto and due process clauses of the United States Constitution.

**6. The district court properly granted the State's motion for summary dismissal of Dunlap's claims that SAPD provided ineffective assistance of appellate counsel by failing to raise issues related to the impartiality of the jury.**

Dunlap raises four ineffective assistance of appellate counsel claims relating to the impartiality of the jury. Dunlap argues: (a) SAPD failed to raise the claim that Juror 263 was

---

[5] Although not a basis for our decision, we note that SAPD's failure to raise this claim was not objectively unreasonable. SAPD did challenge J.I. 14 in the appeal from Dunlap's resentencing. SAPD argued that the term "sufficiently compelling" in J.I. 14 was vague and ambiguous. SAPD asserted that without a limiting definition, "sufficiently compelling" left the jury without a clear indication of the quantum of evidence required to make a death sentence unjust. This Court disagreed, and determined in *Dunlap V* that it was unnecessary to define the phrase because it was comprised of ordinary words that did not require a definition. 155 Idaho at 365, 313 P.3d at 21.

To show deficient performance, Dunlap must overcome the strong presumption that appellate counsel was competent, diligent, and made significant decisions using reasonable professional judgment. *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Booth v. State*, 151 Idaho 612, 618, 262 P.3d 255, 261 (2011). Considering one of the widely recognized hallmarks of effective appellate advocacy is weeding out issues on appeal, the fact that SAPD raised an issue directly related to the language of J.I. 14 in the direct appeal suggests SAPD made a tactical and strategic decision as to how to attack this particular instruction. Selection of a different avenue of attack on J.I. 14 is consistent with the exercise of appellate counsel's reasonable professional judgment.

improperly excluded for cause; (b) SAPD failed to raise the claim that eleven jurors should have been excluded for cause based on their bias in favor of imposition of the death penalty; (c) SAPD failed to raise the claim that trial counsel provided ineffective assistance of counsel during voir dire; and (d) SAPD failed to raise the claim that Preliminary Instruction P-3 was unconstitutional because it led to the seating of jurors who were substantially impaired in their ability to serve as impartial jurors. Because each of these issues relates to the right to trial by an impartial jury, we will discuss the governing legal principles before turning our consideration to the specific issues Dunlap has raised.

The Idaho Constitution provides that "[t]he right of trial by jury shall remain inviolate." Idaho Const. art. 1 § 7. The Sixth Amendment of the United States Constitution, as made applicable to the states through the Fourteenth Amendment, mandates that the right to a jury trial includes the right to an *impartial* jury. *State v. Moses*, 156 Idaho 855, 862, 332 P.3d 767, 774 (2014); *see Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) ("It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury."). Thus, "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Moses*, 156 Idaho at 862, 332 P.3d at 774 (quoting *State v. Brooks*, 103 Idaho 892, 896, 655 P.2d 99, 103 (Ct. App. 1982)).

"The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Id.* (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). Importantly, "[t]he bias or prejudice of even a single juror is enough to violate that guarantee." *United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013) (quoting *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000)); *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (if even one juror who will automatically vote for the death penalty "is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence"); *Adams v. Texas*, 448 U.S. 38, 51 (1980) ("the Constitution disentitles the State to execute a sentence of death imposed" by an impartial jury). "Accordingly, '[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.' " *Olsen*, 704 F.3d at 1189 (quoting *Gonzales*, 214 F.3d at 1111).

"[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial . . . so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Ross*, 487 U.S. at 86 (alteration in

original) (quoting *Lockhart v. McCree*, 476 U.S. 162, 184 (1986)); *see also State v. Ellington*, 151 Idaho 53, 69, 253 P.3d 727, 743 (2011) ("A juror is presumed to be impartial."). "A juror lacks impartiality if actual or implied bias exists, and the Idaho Code provides criminal defendants with the right to strike a biased juror for cause." *State v. Abdullah*, 158 Idaho 386, 421, 348 P.3d 1, 36 (2015) (citing I.C. §§ 19-2017, -2019, -2020).

In a capital sentencing case, jurors may be excluded due to their views on the death penalty, which result in bias. *Wainwright v. Witt*, 469 U.S. 412, 429 (1985). "[A] juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan*, 504 U.S. at 728. The reverse of this is also true: "[a] juror who will automatically vote for the death penalty in every case" is not an impartial juror and must be removed for cause. *Id.* at 729. As the United States Supreme Court held in *Witt*:

> the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45); *see State v. Enno*, 119 Idaho 392, 398, 807 P.2d 610, 616 (1991).

Because the trial court "is in a position to determine first hand whether a juror can render a fair and impartial verdict," the decision to excuse potential jurors is within the trial court's discretion and will not be reversed absent an abuse of discretion. *Moses*, 156 Idaho at 863, 332 P.3d at 775; *accord Morgan*, 504 U.S. at 727. Trial judges "must reach conclusions as to impartially and credibility by relying on their own evaluations of demeanor evidence and of responses to questions." *Moses*, 156 Idaho at 863, 332 P.3d at 775 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)). Findings of impartiality based on "demeanor and credibility . . . are peculiarly within a trial judge's province" and are entitled to deference on review. *Witt*, 469 U.S at 428; *see Uttecht v. Brown*, 551 U.S. 1, 8 (2007). Further, while "the court is entitled to rely on assurance from venire persons concerning partiality or bias," these assurances are "not always dispositive." *State v. Hairston*, 133 Idaho 496, 506, 988 P.2d 1170, 1180 (1999).

In *Uttecht*, the United States Supreme Court succinctly summarized the governing legal principles as follows:

First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

551 U.S. at 9 (internal citations omitted).

### a. Juror 263 was not improperly excluded for cause under *Witherspoon.*

Dunlap argues SAPD should have raised the following issue on appeal: that the district court improperly excluded prospective Juror 263 based on his[6] opposition to capital punishment. The district court granted the State's motion for summary dismissal concluding that exclusion of Juror 263 for cause was proper and thus, Dunlap failed to show that SAPD's performance was deficient.

Dunlap argues that failure to raise this claim constituted ineffective assistance of appellate counsel and that the district court erred in summarily dismissing this claim. Specifically, Dunlap alleges Juror 263 was improperly excluded in violation of the rule pronounced in *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). There, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522. In *Witt*, the United States Supreme Court revisited the issue and explained that *Witherspoon* "is not a ground for challenging" a prospective juror, but is rather is a limitation on a State's power to exclude potential jurors. 469 U.S at 423 (quoting *Adam*s, 488 U.S. at 47–48).

In *Witt*, a juror was excused for cause after the juror indicated that personal beliefs about the propriety of the death penalty would "interfere with judging the guilt or innocence of the Defendant." 469 U.S at 416. The defendant argued that the juror was improperly excluded for cause in violation of *Witherspoon. Id.* The Supreme Court disagreed, clarifying that a finding of bias does not require the juror to make it "unmistakably clear" that he would "automatically"

---

[6] For purposes of anonymity of all jurors, we will use male pronouns without regard for the gender of the individual juror.

vote against the death penalty, but that exclusion is proper if the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424 (quoting *Adams*, 448 U.S. at 45). Thus, the State "may properly challenge" a prospective juror if he "refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge." *Id.* at 422. As the California Supreme Court explained, "[a] juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict." *California v. Martinez*, 213 P.3d 77, 98 (Cal. 2009).

In his responses to the jury questionnaire, Juror 263 indicated that he disagreed with the proposition that "murder is murder and that understanding motives and circumstances is not important;" disagreed with the statement that "I do not believe criminals can be rehabilitated;" agreed that he was uncomfortable with having to decide about executing someone; and disagreed with the notion that life without the possibility of parole is not a harsh enough penalty for murder. Juror 263 disagreed with the proposition that "only the worst murderers should be executed;" agreed that he could vote for the death penalty in some cases if on the jury; and had no opinion as to whether it would be hard for him to vote to kill someone. When asked how he felt about the death penalty he indicated: "When they are guilty of taking a life then they should be able to give a life." He said he supported the death penalty, and indicated that the following statement most accurately represented the way he felt about the death penalty: "I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case." Juror 263 indicated that he did not feel that his views on the death penalty would prevent or substantially impair his ability to view the facts impartially or that his views on the death penalty would prevent or substantially impair his ability to impose the death penalty.

During individual voir dire the following exchanges took place:

**Q [Counsel for Dunlap]:** When you were asked about how you feel about the death penalty, you indicated, "When they are guilty of taking a life, then they should be willing to give a life."

**A [Juror 263]:** Uh-huh.[7]

**Q:** What do you mean by that?

**A:** Well, you are going to play, you have got to pay.

---

[7] In earlier proceedings, the transcript indicated "uh-huh" as affirmative.

**Q:** Is that similar to an eye for an eye, and a tooth for a tooth?

**A:** Yeah. I have a question, though, if I could really fast. In the big room, did you say he had mental problems?

**Q:** That is going to be something that we are going to talk about.

**A:** Well, on that fact *I don't think I could give you a verdict of death. There is just no way.* I know about mental illness and there is just no way.

**Q:** How do you know about mental illness?

**A:** I have a stepsister.

**Q:** What has she been diagnosed with?

**A:** Paranoid schizophrenia.

**Q:** If you hear evidence about Tim Dunlap having a mental illness, is that going to change your opinion on an eye for an eye?

**A:** Yes.

**Q:** That is something that the judge is going to tell you about, aggravating circumstances of the crime, mitigating circumstances of the crime, and you now understand that sometimes there are explanations?

**A:** Yes, I do.

**Q:** It doesn't get him out of being guilty.

**A:** Correct.

. . . .

**Q [Counsel for the State]:** If you were chosen as a juror on this case and the Judge instructed you on the law and you disagreed with it, would you still be willing to follow the law?

**A:** Well, yeah.

**Q:** You talked a little bit about – it sounds like you have some pretty strong opinions on mental illness, and what that evidence might mean; is that fair to say?

**A:** Yeah.

**Q:** If the facts and evidence in this case indicated that the death penalty was appropriate, and that being that the aggravating factors of this crime were not outweighed by any mitigation, *would you refuse to give the death penalty just based on evidence that he might have had some mental problems*?

**A:** That is a hard one to answer. *I am not sure.*

**Q:** I guess my question is, *would you give more weight to the fact that there may be mental illness than you would the other evidence*?

**A:** On my past experience with my stepsister, I would have to say yeah.

**Q:** So if there is evidence of *any sort* of mental problems, you could not give the death penalty?

**A:** *I could not.*

The district court then sustained the State's challenge to Juror 263, concluding that based the juror's statements regarding evidence of mental problems disqualified him from sitting on the jury. Dunlap's counsel did not object and did not seek to make further inquiry.

Under *Witt*, removal for cause was proper if Juror 263's views would substantially impair his ability to perform his duties as a juror in accordance with his instructions and oath. The jury was instructed that if the State proved one or more statutory aggravating circumstances, the jury would be required to "decide whether the imposition of the death penalty would be unjust by *weighing* all mitigating circumstances against each statutory aggravating circumstance . . . ." Juror 263's statement that if there was *any* evidence regarding mental illness he "could not" impose the death penalty suggests an inability to weigh mitigating circumstances against any aggravating circumstance. The district judge was in a position to observe Juror 263's demeanor as he responded to questions from counsel. His decision that Juror 263 could not serve as an impartial juror is entitled to deference. We conclude that the district court did not abuse its discretion in granting the State's motion to excuse Juror 263 for cause. Consequently, Dunlap was not prejudiced by SAPD's failure to raise this claim on appeal and the district court did not err by summarily dismissing this claim.[8]

### b. There were no substantially impaired jurors under the standard announced in *Morgan v. Illinois*.

Dunlap argues that SAPD rendered ineffective assistance of appellate counsel by failing to raise the following claim on appeal: the district court should have *sua sponte* removed eleven jurors for cause because they would automatically vote for the death penalty in every case. The district court concluded that it was not reasonably probable that any of the eleven jurors would have been excused for cause and thus, concluded that summary dismissal was appropriate for

---

[8] Although we decide this claim solely on the prejudice prong, this is another instance where a showing of deficient performance is utterly lacking. To overcome the presumption that appellate counsel was competent and diligent, Dunlap had the burden of showing that SAPD failed to act reasonably by failing to raise this issue on appeal and that the decision was based on inadequate preparation, ignorance of the law, or other shortcomings capable of objective review. *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Booth v. State*, 151 Idaho 612, 618, 262 P.3d 255, 261 (2011). SAPD raised this precise issue in Dunlap's 2008 Petition and briefed it thoroughly. The district court found no error, and SAPD did not raise the issue on its direct appeal to this Court. Considering one of the widely recognized hallmarks of effective appellate advocacy is weeding out issues on appeal, and the fact that SAPD raised this issue in the 2008 Petition but chose not to raise it on appeal, Dunlap failed to overcome the presumption that SAPD acted reasonably. *See Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

each of these claims because Dunlap did not show he was prejudiced by SAPD's failure to raise these claims on appeal.

During jury selection, Dunlap passed for cause each of the eleven jurors he now alleges were not impartial. Dunlap accepted the jury as empaneled. Thus, Dunlap's claim is that appellate counsel was ineffective for failing to claim on appeal that the district court erred by failing to *sua sponte* remove all eleven jurors for bias.

Generally, failure to exhaust available means for excluding unacceptable jurors precludes the consideration on appeal of a claim of error in seating the juror. *State v. Johnson*, 145 Idaho 970, 979, 188 P.3d 912, 921 (2008). "[F]ailure to challenge a juror for cause 'indicates a satisfaction with the jury as finally constituted.' " *Id.* (quoting *State v. Bitz*, 93 Idaho 239, 243, 460 P.2d 374, 378 (1969)). However, this Court will consider such issues for fundamental error. *Id.*; *see State v. Perry*, 150 Idaho 209, 224, 245 P.3d 961, 976 (2010) ("If the alleged error was not followed by a contemporaneous objection, it shall only be reviewed . . . under Idaho's fundamental error doctrine.").

To succeed on a claim that the district court erred by failing to *sua sponte* remove a juror for cause, where, "as here, no motion was made during jury selection to dismiss the juror in question for cause," the defendant "assumes a greater burden: he must show that the evidence of partiality before the district court was so indicative of impermissible juror bias that the court was obliged to strike [the juror] from the jury, even though neither counsel made the request." *United States v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009); *but cf. People v. Metcalfe*, 782 N.E.2d 263, 271 (Ill. 2002) ("We decline to impose a duty upon a trial court to sua sponte excuse a juror for cause in the absence of a defendant's challenge for cause or exercise of a peremptory challenge."); *accord Cage v. McCaughtry*, 305 F.3d 625 (7th Cir. 2002).

We will consider the governing standard before proceeding to analyze Dunlap's claims regarding each of the eleven jurors. Our focus will be on the prejudice prong, i.e., if SAPD had advanced a claim that the juror should have been excused for cause the result of the appeal would have been different.

### i.    The *Morgan* Standard

In *Morgan v. Illinois*, the United States Supreme Court concluded:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already

formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

504 U.S. 719, 729 (1992). The standard is whether jurors' "views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oath." *Id.* at 728 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotations omitted)).

The United States Supreme Court has explained that when the state's capital punishment scheme requires the jury to weigh and consider mitigating evidence, "[a]ny juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider mitigating evidence . . . ." *Id.* at 738. Thus, jurors who "deem mitigating evidence to be irrelevant to their decision to impose the death penalty," and those jurors who "refuse to give such evidence any weight" should be disqualified for cause. *Id.* at 736. This is because "consideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

To make this determination, courts look to the entirety of the juror's responses regarding their views toward capital punishment. Thus, while jury questionnaires may squarely address *Morgan* issues, a juror may be rehabilitated in voir dire, and the trial judge has discretion to determine whether the juror's views would prevent or substantially impair his ability to perform his duties as an impartial juror. *See, e.g., Treesh v. Bagley*, 612 F.3d 424, 438 (6th Cir. 2010) (weighing juror's initial responses with later explanations to determine that juror could take into account mitigating factors); *Ledford v. Georgia*, 709 S.E.2d 239, 250 (Ga. 2011) (looking to potential juror's responses "as a whole"); *Sanchez v. Oklahoma*, 223 P.3d 980, 997 (Okla. Crim. App. 2009) ("A review of the entire voir dire shows that the District Court could readily distinguish between the prospective jurors who were initially befuddled by the automatic death penalty question and those irrevocably committed to imposing the death penalty for murder."). Indeed, "[i]t is not uncommon for jurors to express themselves in ambiguous and seemingly contradictory ways," and thus, given the superior ability of the judge to observe the prospective juror, we extend substantial deference to the trial judge's assessment as to which statements and

assertions best demonstrate the juror's actual conceptions. *New Hampshire v. Addison*, 87 A.3d 1, 64 (N.H. 2013) (citing *Paton v. Yount*, 467 U.S. 1025, 1038–40 (1984)).

We now address each juror whom Dunlap alleges to have been substantially impaired. In each instance, the district court determined that Dunlap could not show prejudice resulting from SAPD's failure to raise the claim because the district court found the challenged juror was not biased.

### ii.    Juror 279

Dunlap argues that Juror 279 was an "automatic death" juror and that he should have been excused for cause because he demonstrated dogmatic views of fairness, indicated he would not consider mitigating evidence of the defendant's childhood, and was predisposed on the propensity aggravator.

Juror 279 endorsed the statement "I generally favor the death penalty, but I would base a decision to impose it on the facts and the law in the case." In his questionnaire, Juror 279 indicated he believed "that a defendant who does not testify is probably guilty or has something to hide" and that "a person on trial who does not take the witness stand and deny the crime is probably guilty." Juror 279 also answered "yes" to the question: "If the defendant exercises his Constitutional right to remain silent and does not testify, would you hold that against him and consider it as an indication of guilt?" Juror 279 strongly agreed with the proposition that "our society would be stronger if the death penalty were imposed more often."

Juror 279 agreed with the following: "murder is murder, and understanding motives and circumstances is not important;" that "life in prison without the possibility of parole is not a harsh enough penalty for murder;" that "it doesn't matter what kind of childhood a murderer had;" and that "people who kill should be punished no matter what the circumstances are." Juror 279 disagreed that it would be hard for him to vote to kill someone, and strongly disagreed that "only the worst murderers should be executed." Juror 279 supported the death penalty, explaining "I believe in the death penalty, I believe if the crime warrants it, it should be administered. We need some deterrent to murder and crime."

However, Juror 279 also indicated that "the burden of proof should be greater than beyond a reasonable doubt," stating that "I feel you should be sure through the evidence that he or she did the crime with out [sic] doubt." Juror 279 agreed that the jury should be required to follow the law and jury instructions and did not agree the jury should be free to disregard the

law, even if they disagree with it. Juror 279 agreed he would follow the instructions upon the law given by the judge even if he thought the law was different or disagreed with the law as instructed by the judge. Juror 279 strongly agreed with the proposition that "every defendant is innocent and remains so unless the State can prove otherwise." And Juror 279 agreed with the following statements: "I am uncomfortable about having to decide about executing someone;" that "a person's upbringing influences the ability to make decisions later in life;" and that "I would review all the evidence before I made a decision in this case."

During individual voir dire, Juror 279 responded to counsel, in pertinent part, as follows:

**Q [Counsel for the State]:** Based on those questions, are there any issues that you see that would prevent you from being a fair and impartial juror in this case?

**A [Juror 279]:** No.

. . . .

**Q:** I think you indicated that you wanted to see proof beyond all doubt, and I guess my question to you is, knowing what you know about the case now, is that still your opinion? Would you hold the State to a higher burden?

**A:** To a point. You know, a lot depends on what the Judge – the rules that the Judge lays down for the case which I don't know.

. . . .

**Q:** So you wouldn't hold the State to a higher burden? You wouldn't disregard the Court's instructions?

**A:** No.

**Q:** If you are chosen as a juror on this case, you will hear the evidence and the Judge will instruct you on the law. At the end of the case, the State is going to be asking you to find that the law requires the death penalty. How do you feel about that?

**A:** I believe in the death penalty.

**Q:** How do you feel about being the one that has to make that decision?

**A:** That is a difficult [sic] because I have not had to live that out, you know, my beliefs before. So it is not the easiest, you know.

**Q:** Exactly.

**A:** Which you understand that, I know, but I believe that I can make that choice.

**Q:** Okay. You believe that you can make your decision solely upon the evidence presented in court and the law as the judge instructs it?

**A:** Uh-huh.

**Q:** You wouldn't let your personal feelings about the death penalty come in and affect your decision?

**A:** Well, you know, I thought about that a lot the last couple of days to be fair, you know, because I have to be fair too, and I believe I can when I thought it through.

. . . .

**Q [Counsel for Dunlap]:** Do you feel that you could give Tim due benefit by listening to the evidence that we presented?

**A:** I believe so, yes, because, like I said, I felt a lot the last two days trying to figure it out.

**Q:** I understand that you haven't actually heard any evidence yet, but you are certainly going to sit there and weigh it, okay?

**A:** Yes.

**Q:** You feel that you are a fair person, you are open-minded about things?

**A:** Uh-huh. To a point, uh-huh.

**Q:** To what point is that?

**A:** Being fair human nature-wise. I mean, I have my own set of absolutes and rules. You know, we all have that we live by. But I work with a lot of people, so I have learned – I work in a restaurant, so I have learned to deal with a lot of different backgrounds and a lot of different people, and to learn to not judge from that. You understand?

**Q:** Sometimes people can surprise you, is that what you are saying?

**A:** Yes, I do [sic].

. . . .

Dunlap identifies two problems with Juror 279's responses. The first is that Juror 279 indicated that he had his "own set of absolutes and rules." Dunlap asserts that this response, coupled with Juror 279's answers to the questionnaire, show that he is a juror who would automatically vote for the death penalty in every case without consideration for the actual evidence presented at trial. *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006) is informative as to this claim. In *Brown*, a potential juror, when asked whether she would make her decision to impose the death penalty on her own "internal set of values or on what the law is" as provided by the judge, responded: "I believe I would probably make the decision based upon my own internal values." 441 F.3d at 1356. Counsel pressed by asking: "Even if those might conflict and be different than what [the judge] is telling the jury to apply?" *Id.* at 1357. The potential juror responded, "[y]es." *Id.* The court determined that because the potential juror would vote based on her own internal values, not on the instructed law, the district court properly struck the juror for cause, despite the fact the juror stated she "would want to listen to all the

facts and had not predetermined whether she would vote for or against the death penalty." *Id.* at 1356.

Here, Juror 279's responses are markedly different from those in *Brown.* Juror 279's response that he had his "own set of absolutes and rules" was not in response to a question regarding following instructions; rather, it was made in reference to whether he was fair and open-minded. Unlike in *Brown*, at no point did Juror 279 indicate that his "own set of absolutes and rules" would prohibit him from considering the facts or following the law as he was instructed. To the contrary, Juror 279 indicated several times that he wanted to listen to all the evidence, stating "I really believe I want to hear the facts." Juror 279 also indicated that how he treated the case would depend on "the rules that the Judge lays down," indicating a clear understanding that the judge would provide the standard he would be required to apply. While his questionnaire responses clearly indicate he favored the death penalty, he agreed that he would follow the court's instructions and consider all the evidence.

The second problem with Juror 279, Dunlap argues, is that he could not give effect to mitigating evidence. In his questionnaire responses, Juror 279 agreed that it "doesn't matter what kind of childhood a murderer had" and "[p]eople who kill should be punished no matter what the circumstances are." Dunlap argues that this necessarily means that Juror 279 could not give effect to mitigating evidence. When considering challenges for cause, a trial court should evaluate whether a prospective juror's views would "prevent or substantially impair" the juror's ability to follow the court's instructions. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). If the court is left with the "definite impression that a prospective juror would be unable to faithfully and impartially apply the law," that juror should be excused. *Id.* at 426. Therefore, as a part of its inquiry, the court must evaluate whether a juror would be able to faithfully and impartially apply the law regarding mitigating factors.

Here, we note that the questionnaire asks potential jurors to identify how each proposition relates to their personal beliefs; it is not a direct question regarding the juror's ability to apply the law regarding mitigating factors. At no point did Juror 279 indicate that he would not consider those factors. Albeit rather broadly, Juror 279 indicated that he would follow the law even if he disagreed with it, that he really wanted "to hear the facts," and that he believed the death penalty was appropriate "if the crime warrants it." He also indicated that he believed he could give "due benefit" to all the evidence presented, and that he agreed that "[a] person's upbringing influences

the ability to make decisions later in life." Indeed, Juror 279 indicated that he did not believe the jury should be free to disregard the law, and he would follow the instructions on the law given by the judge, even if he disagreed. These responses do not present a compelling case that Juror 279 would fail to consider mitigating evidence when instructed to do so by the court.

Ultimately, it is far from clear that Juror 279's views prevented or impaired his ability to follow the court's instructions and apply the facts to the law. As we must give deference to the trial judge, who was able to observe the juror's demeanor during his questioning by counsel, we are unable to hold that the record demonstrates that Juror 279 was a juror unable to conscientiously apply the law and find the facts. Therefore, Dunlap's constitutional right to an impartial jury was not violated by the district court's failure to *sua sponte* remove Juror 279 for cause and there was no prejudice resulting from SAPD's failure to raise this claim on appeal.

### iii.    Juror 293

Dunlap asserts that Juror 293 only agreed capital punishment was inappropriate in instances of lesser degrees of murder, not due to mitigating factors, such that Juror 293 would automatically impose the death penalty upon anyone convicted of first-degree murder. Dunlap further argues that Juror 293 indicated he would not consider mitigating evidence regarding Dunlap's childhood.

In the questionnaire, Juror 293 indicated he agreed with the following propositions: "I support the use of the death penalty," and "it doesn't matter what kind of childhood a murderer had." Juror 293 also indicated he disagreed with the following: "only the worst murderers should be executed;" and "it would be hard for me to vote to kill someone." When asked to identify the most accurate representation of his feelings on the death penalty, Juror 293 selected the following response: "I generally favor the death penalty but would base a decision to impose it on the facts and the law of the case." When the questionnaire asked, "How do you feel about the death penalty?" Juror 293 answered: "In some cases it is fair and warranted." Juror 293 also indicated that he did not feel that his views on the death penalty would prevent or substantially impair his ability to view the facts or impose the death penalty impartially. Further, Juror 293 indicated that he agreed that a person's upbringing influences their ability to make decisions later in life, and that he would review all of the evidence before he made a decision.

In individual voir dire, counsel delved into Juror 293's response to the question "How do you feel about the death penalty?":

**Q [Counsel for Dunlap]:** You wrote, "In some cases it is fair and warranted." You generally support the death penalty. What does that mean?

**A [Juror 293]:** Well, basically I think you take it case by case. In my opinion, you know, if someone has thought it out, planned it, and then they execute it the way they had planned, I think it is different than something of a spur-of-the-moment type thing. That is kind of what I mean by that.

. . . .

**Q:** Have you made up your mind yet that this is a case that he should get life imprisonment without parole, or the death penalty?

**A:** No.

**Q:** You understand that if you are selected as juror, that would be your job?

**A:** Correct.

**Q:** Are there ever cases in your mind where a death penalty would not be appropriate?

**A:** Yeah, I think there is [sic].

. . . .

**Q [Counsel for the State]:** Do you think you can listen to the evidence and follow the law as the Judge instructs it?

**A [Juror 293]:** Yes.

**Q:** You think you have any bias for or against either side?

**A:** No, I don't.

Dunlap argues that Juror 293's responses indicate that he believed capital punishment was only unwarranted when the defendant has not actually committed first-degree murder. Dunlap argues that since he had pleaded guilty to first-degree murder, Juror 293 would automatically impose the death penalty. However, as one court has observed, "questions put to prospective jurors in a death penalty *voir dire* can be confusing to laypersons," but it is the purpose of voir dire to ask questions which shed light on whether the juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror. *Sanchez v. Oklahoma*, 223 P.3d 980, 997 (Okla. Crim. App. 2009). This observation is relevant to our analysis. When voir dire took place, the prospective jurors had not been instructed as to what constituted aggravating and mitigating circumstance. Potential jurors cannot be expected to provide answers that perfectly accord with Idaho's statutory framework without having been so instructed. *See New Jersey v. Papasavvas*, 751 A.2d 40, 49–51 (N.J. 2000). Dunlap's argument assumes that Juror 293, who had no legal training or experience, was making a purposeful

distinction between mitigating factors and lesser degrees of murder. Juror 293 made it clear that whether a death sentence was warranted depended on the case, he had not yet made up his mind as to whether the death penalty was appropriate, and he would listen to the evidence and follow the law. Juror 293 was not an automatic death juror.

Dunlap also argues that since Juror 293 agreed that it "doesn't matter what kind of childhood a murderer had" he would not give effect to mitigating evidence and was substantially impaired. However, the determination whether a juror is substantially impaired requires consideration of the totality of the record of the juror's statements and questionnaire answers. Juror 293 agreed that upbringing influences a person's ability to make decisions later in life. At no time did Juror 293 indicate that he would not consider mitigating evidence, and he asserted that the determination whether the death penalty was appropriate was to be determined on a case-by-case basis. Viewed in its totality, we are unable to share Dunlap's view that Juror 293 would disregard mitigating circumstances.

Dunlap has not shown that Juror 293's views on capital punishment would prevent or substantially impair him from performing his duties as a juror in accordance with the instructions and his oath. Thus, Dunlap's constitutional right to an impartial jury was not violated by the district court's failure to *sua sponte* remove Juror 293 for cause. Dunlap was not prejudiced by SAPD's failure to raise this claim on appeal.

### iv.    Juror 270

Dunlap argues that Juror 270 was an automatic death juror because he believed that life in prison without the possibility of parole was not a harsh enough penalty for murder and he would not narrow the death penalty to the worst murderers. Dunlap's argument is based on Juror 270's response to two questions in the 27-page questionnaire. He disagreed with the following proposition: "only the worst murderers should be executed;" and agreed that "life in prison without the possibility of parole is not a harsh enough penalty for murder." In individual voir dire, the following exchanges occurred:

> **Q [Counsel for the State]:** [Y]ou will be asked to weigh those aggravating factors against any mitigation evidence the defense chooses to present. Do you feel like you are the type of person that can do that weighing process?
>
> **A [Juror 270]:** I do.
>
> . . . .

37

**Q [Counsel for Dunlap]:** Have you made up your mind in this case that Tim Dunlap should get the death penalty or life in prison without parole?

**A:** No, I haven't.

**Q:** Even though you generally favor the death penalty, you still believe there could be some situation when – there might be a situation that would be unjust to give the death penalty?

**A:** Yes, I believe.

Considering the record as a whole, Juror 270 was not substantially impaired in his ability to follow the court's instructions. Indeed, Juror 270 stated that he felt the "the death penalty is warranted *in some cases*. I feel it is a deterrent to crime." Juror 270's answers in the questionnaire indicate a clear recognition and willingness to consider mitigating evidence. He disagreed with the propositions that "murder is murder, and understanding motives and circumstances is not important" and "it doesn't matter what kind of childhood a murderer had." While he generally favored the death penalty, he also recognized that there are situations when it would be unjust to impose it. Dunlap's constitutional right to an impartial jury was not violated by the district court's failure to *sua sponte* remove Juror 270 for cause and there was no prejudice resulting from SAPD's failure to raise this claim on appeal.

### v.     Juror 164

Dunlap argues that Juror 164 was an automatic death juror because, like Juror 293, the only mitigating circumstance he indicated was important was lack of intent. Dunlap asserts this answer shows Juror 164 would only abstain from imposing capital punishment in instances when the crime was not punishable by death, i.e., in cases not involving first-degree murder. Dunlap also argues that Juror 164 was predisposed to find the existence of the propensity aggravating factor.

In the questionnaire, Juror 164 agreed with the proposition that "someone already convicted of a murder is likely to kill someone else." Juror 164 also indicated that he disagreed with the propositions "it doesn't matter what kind of childhood a murderer had," "understanding the motives and circumstances" of a murder is not important, and life in prison without the possibility of parole is not a harsh enough penalty for murder. While he strongly agreed with the statement "I support the use of the death penalty," he also strongly agreed with the assertion "I am uncomfortable about having to decide about executing someone." Juror 164 felt there "are circumstances under which the death penalty could be an appropriate penalty."

During individual voir dire, Juror 164 answered questions as follows:

**Q [Counsel for the State]:** Do you feel like as a juror as you sit here today, that you could go into this situation with an open mind and do the weighing that is required of the jurors that the Judge is going to instruct you on?

**A [Juror 164]:** Yeah . . . I have thought about this since I filled out the questionnaire, about how difficult it might be to come to that kind of decision. I think the only way that I could come to that decision would be to look at all of the evidence and listen to the instructions accordingly that explains [sic] what the law is, and the only way I could live with it is to look at all of that stuff and weigh it in my own mind and come to a decision for myself, what needs to be done.

. . . .

**Q [Counsel for Dunlap]:** What kind of mitigating factors would you consider the death penalty to be unjust in? Have you thought about that?

**A:** I haven't given that a lot of thought. You know, I think it was you earlier that talked – someone talked about intent.

**Q:** I think it was Mr. Whatcott, but that is correct.

**A:** That would certainly be something that you would have to try and consider.

**Q:** Do you think it would be fair not only to evaluate the circumstances of the actual crime or crimes around the time they happened, but also to look at the history and background of Tim Dunlap?

**A:** I think that would –

**Q:** Looking at everything, how he was raised, things that happened to him as a young man as he approached those events.

**A:** Certainly they ought to be considered.

Juror 164's response regarding intent being a mitigating factor, without having been instructed on what constitutes first-degree murder or a mitigating factor, cannot be understood as meaning that Juror 164 would automatically vote to impose the death penalty in instances of first-degree murder. Dunlap's assertion that Juror 164 was predisposed to find the propensity aggravator is likewise without merit. Juror 164 agreed that the jury should be required to follow the law given in the jury instructions and that the jury is not free to disregard the law even if they disagree with it. This sentiment was reiterated in individual voir dire where Juror 164 explained that the only way he could make the decision would be to look at all of the evidence and listen to the instructions. Juror 164's willingness to consider mitigating circumstances is reflected in his answers regarding the importance of the circumstances of the murderer's childhood and his disagreement with the notion that life in prison without the possibility of parole is inadequate punishment for murder.

Dunlap's constitutional right to an impartial jury was not violated by the district court's failure to *sua sponte* remove Juror 164 for cause. The record does not support Dunlap's contention that Juror 164's views on the death penalty prevented or substantially impaired his ability to serve as an impartial juror. There was no prejudice resulting from SAPD's failure to advance this claim on appeal.

### vi.    Juror 119

Dunlap argues that Juror 119 would also automatically impose the death penalty regardless of the facts and law. In the questionnaire, Juror 119 indicated that he supports the use of the death penalty and believes that life in prison without the possibility of parole is not a harsh enough penalty for murder. Juror 119 disagreed with the following propositions: "only the worst murderers should be executed;" "it would be hard for me to vote to kill someone;" and "I am uncomfortable about having to decide about executing someone."

Juror 119 indicated that he believed understanding the motives and circumstances of a murder were important and that, although he generally favored the death penalty, he would base his decision on the facts and the law of the case. He did not feel that his views on the death penalty would prevent or substantially impair his ability to view the facts impartially or to impose the death penalty. He disagreed with the statements that "understanding motives and circumstances is not important" and "I do not believe criminals can be rehabilitated." Juror 119's questionnaire responses repeatedly reflected his belief that a person's upbringing is important to understanding the circumstances of the crime.

The questionnaire provided a general procedural statement, followed by an open-ended question regarding the prospective jurors' views on capital punishment:

> Persons convicted of First Degree Murder <u>cannot</u> automatically be given the death penalty. Before the jury could impose the death penalty, there will be a hearing on the appropriate penalty, and the jury would have to find that the death penalty was appropriate under the guidelines set by Idaho law. Evidence will be presented regarding the appropriate penalty. How do you feel about the death penalty?

Juror 119 responded: "If a person commits a crime that is punishable by the death penalty – so be it . . . ."

In individual voir dire, counsel addressed this response:

**Q [Counsel for Dunlap]:** [H]ow do you feel about the possibility of sitting on a death penalty case and determining life or death for somebody?

**A [Juror 119]:** You know, I don't suppose anybody would want to do it but I would be prepared to do it.

**Q:** Is that anything that you feel you can do fairly and impartially?

**A:** I believe so.

. . . .

**Q:** I noticed that in your questionnaire when you were asked how do you feel about the death penalty, your statement was "If a person commits a crime that is punishable by the death penalty," which this one is as we know, "so be it." What does that mean "so be it?"

**A:** You know, I would just think that if the crime fits the punishment, then that is how it ought to be.

**Q:** And how do you determine whether the crime fits the punishment or how is that?

**A:** I suppose that is what we are doing here. We are going to have to determine that.

. . . .

**Q:** You understand that with mitigating evidence, that life imprisonment without the possibility of parole is what we are talking?

**A:** Uh-huh.

**Q:** And that that is always a reasonable option for a jury?

**A:** Yes.

Looking to voir dire as a whole, while Juror 119 was supportive of the death penalty, his answers indicate receptiveness to evidence in mitigation. Juror 119's answers indicated that he believed the task of the jury was to determine whether the punishment fit the crime. The record does not support Dunlap's claim that Juror 119's views on capital punishment prevented or substantially impaired his ability to weigh the aggravating and mitigating circumstances. Dunlap's constitutional right to an impartial jury was not violated by the district court's failure to *sua sponte* excuse Juror 119 for cause. Dunlap was not prejudiced by SAPD's failure to advance this claim on appeal.

### vii.    Juror 3

Dunlap argues that Juror 3 would automatically vote to impose the death penalty based on his agreement with two propositions in the questionnaire. Juror 3 agreed with the statement that "it doesn't matter what kind of childhood a murderer had" and that "someone already convicted of a murder is likely to kill someone else."

Juror 3 strongly agreed with the assertion that "it doesn't matter what kind of childhood a murderer had" but also strongly agreed that "a person's upbringing influences the ability to make decisions later in life." Juror 3 disagreed that "life in prison without the possibility of parole is not a harsh enough penalty for murder." Juror 3 also agreed that "someone already convicted of a murder is likely to kill someone else." Juror 3 supported the death penalty, responding in the questionnaire that the death penalty "could be an effective deterrent to crime if imposed more consistently and more timely" and that it was an "appropriate measure to protect society from crime/criminals."

In individual voir dire, Juror 3 expanded upon his beliefs:

**Q [Counsel for the State]:** [A]re you willing to vote against [the death penalty] if the evidence doesn't show it?

**A [Juror 3]:** I think I am fairly objective, sir, yes, in mind [sic].

**Q:** And so you feel like you can give both the State and the defense a fair shake in this case?

**A:** Yes, sir.

. . . .

**Q [Counsel for Dunlap]:** Couple of questions about your questionnaire . . . . You indicated that the death penalty, when asked about how you feel about it, "Could be an effective deterrent if it was imposed more consistently and more timely" . . . . What do you mean by "more consistently?"

**A [Juror 3]:** I believe the inconsistencies in our society lead to ambiguities and it is hard to judge on how people view those things, but if there is a universal standard, if there is ever such a thing in a democracy, then it would be more universally understood. And I know state-to-state and community-to-community and jury-to-jury is going to change. So that may be nirvana, kind of a utopia statement, but it is just something I believe.

. . . .

**Q:** You also understand that when we talk about mitigating evidence, we are not implying mitigating factors that excuse Tim's behavior of what he did?

**A:** I understand, sir.

**Q:** But as jurors you go through a weighing process to see whether the mitigating factors outweigh the aggravating circumstances?

**A:** Yes, sir.

**Q:** Is that something that you feel you can do fairly and justly?

**A:** Certainly, sir.

**Q:** Is there any reason that you can think of that you could not do that?

**A:** I can't think of any circumstances that would influence that sir, no.

Dunlap's assertions that Juror 3 is an automatic death juror are based entirely on his responses to two questions in the questionnaire. Looking to the record as a whole, Juror 3 indicated he would review all the evidence before making a decision, would listen to the other jurors if he did not agree, and that while he favored the death penalty, he would base a decision to impose it on the facts and law of the case. Juror 3 also indicated that he did not feel his views on the death penalty would impair his ability to view the facts or impose the death penalty impartially. Juror 3's responses indicate a commitment to standards and consistency, reflecting his determination to apply the law. Dunlap's constitutional rights were not violated by the district court's failure to excuse Juror 3 on its own initiative and Dunlap was not prejudiced by SAPD's failure to raise this claim on appeal.

### viii. Jurors 226, 150, and 151

Dunlap argues that three jurors should have been excused as automatic death jurors based solely on their agreement with the proposition in the questionnaire that "it doesn't matter what kind of a childhood a murderer had."

Juror 226 responded that he agreed that "it doesn't matter what kind of childhood a murderer had." However, he also disagreed with the statements that "murder is murder, and understanding motives and circumstances is not important" and "life in prison without the possibility of parole is not a harsh enough penalty for murder." While Juror 226 supported the death penalty, he wrote: "I feel it can be necessary, but should be used with extreme caution. It is not to be used loosely and must be used only after careful deliberation." He strongly agreed that he would listen and review all the evidence before making a decision in the case.

Juror 226's apparent dismissal of the mitigating value of evidence regarding a murderer's childhood is inconsistent with his answers to several other questions touching on the importance of mitigating evidence. His support of the death penalty was tempered by his conviction that capital punishment must only follow "careful deliberation" and reflect "extreme caution." Juror 226 indicated that he could fairly and justly weigh evidence about mitigating factors and endorsed the statement that most accurately represented his feelings on the death penalty as: "I am generally opposed to the death penalty, but I believe I can put aside my feelings against the death penalty and impose it if it [sic] is called for by the facts and law in the case." Juror 226's answers indicate his verdict would be made based entirely on the facts in front of him and the

law provided in the court's instructions. They fall short of demonstrating that Juror 226 would disregard mitigating evidence regarding Dunlap's childhood.

Juror 150 also responded that he agreed that "it doesn't matter what kind of childhood a murderer had." He indicated that while he supported the death penalty, when asked "how do you feel about the death penalty?" he responded: "It is appropriate in some cases. It is not appropriate for all cases. You must decide on a case by case basis." Importantly, Juror 150 disagreed with the assertion that "people who kill should be punished no matter what the circumstances are." In voir dire, Juror 150 indicated that to determine whether capital punishment was appropriate, "you would just have to weigh out all of the evidence. If the crime [fits] for that penalty, that is what you should hand down, after weighing out all of the evidence."

Juror 151 also responded that he agreed that "it doesn't matter what kind of childhood a murderer had." He indicated that he had no opinion regarding the assertion that "people who kill should be punished no matter what the circumstances are" and "a person's upbringing influences the ability to make decisions later in life." While supportive of the death penalty, he stated that "I feel it has a place but you have to use it with caution and only when warranted." When asked to explain how he felt about imposing the death penalty, he stated:

> I think, you know, we have been asked if we are chosen to look at the circumstances and go above what our personal things are and provide what the law instructs you to do and keep that out of it. That is very important 'cause that is what our society is based on, to be able to take ourselves out of it. Yeah, it is easy to have biases sometimes but I think we need to be honest with ourselves in the purpose because I think it is a serious question.

Juror 151 did not feel that jurors should be free to disregard the law given in the jury instructions if they disagreed with the law.

With these three jurors, Dunlap focuses on their response to a single question in the questionnaire without regard for the other answers and statements provided in voir dire, which, when reviewed, contradict his claim that these three jurors were automatic death jurors. Each juror indicated that he would support the death penalty only if it was warranted by the facts, circumstances and law. A juror is an automatic death juror if the juror "will fail in good faith to consider the evidence of aggravating and mitigation circumstances as the instructions require him to do." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). The record does not reflect that the jurors would not consider evidence of Dunlap's childhood as mitigating evidence if instructed to do so. Dunlap's constitutional right to an impartial jury was not violated by the district court's

failure to *sua sponte* remove these three jurors for cause. Dunlap has not shown prejudice resulting from SAPD's failure to advance this claim on appeal.

### ix.    Juror 97

Dunlap argues Juror 97 was substantially impaired based solely on his agreement with the assertion "someone already convicted of a murder is likely to kill someone else." Dunlap argues that Juror 97 was predisposed on the existence of this aggravating factor such that he would fail in good faith to consider the evidence regarding the propensity aggravating factor.

In the questionnaire, Juror 97 indicated that he believed the State's burden of proof should not be lower than proof beyond a reasonable doubt; that he would not apply a lesser burden; and agreed that the jury should be required to follow the law given in the jury instructions. Nothing in Juror 97's responses indicate that he would not follow the instructions that required the State prove an aggravating circumstance beyond a reasonable doubt.

Dunlap's assertion that one answer *alone* renders Juror 97 a juror who would automatically vote to impose death ignores the remainder of his answers, and is in conflict with the requirement that a juror's voir dire be considered as a whole. In individual voir dire, when asked if there was any reason that he would not be a fair and impartial juror in this case, he responded:

> **A [Juror 97]:** Emotions would play a part in it no matter what, but I also feel like I have enough that I understand the law as it is presented to me. I believe that we are supposed to follow that. Because of that, I feel like I would do what was right.
>
> **Q [Counsel for the State]:** So you are willing to put any of your personal beliefs or emotions that might arise during the trial aside and listen to the evidence and base your decision solely upon that and solely upon the law?
>
> **A:** Yeah.

It is important to observe that the response which Dunlap argues conclusively shows Juror 97 was predisposed to find the propensity aggravator was given to a question which asked about the juror's personal beliefs. Juror 97 repeatedly indicated that he would follow the law and instructions regardless of his agreement with them. We further note that the propensity aggravator requires substantially more than the limited proposition addressed in the questionnaire. The propensity aggravator instruction spoke in terms of the "willing, predisposed killer, a killer who tends toward destroying the life of another" and noted that "[p]ropensity requires a proclivity, a susceptibility, and even an affinity towards committing the act of murder." Juror 97's agreement with the proposition contained in the questionnaire does not

establish that he was substantially impaired in his ability to impartially decide whether this aggravating circumstance existed.

Dunlap's constitutional rights were not violated by the district court's failure to remove Juror 97 on its own initiative and Dunlap was not prejudiced by SAPD's failure to raise this claim on appeal.

### x.    Juror 245

Finally, Dunlap argues that Juror 245 was substantially impaired based on his agreement that "someone already convicted of a murder is likely to kill someone else" and because he agreed that "it doesn't matter what kind of a childhood a murderer had." Dunlap argues Juror 245 would fail to consider mitigating evidence and was predisposed to find the propensity aggravator.

Juror 245 disagreed with the assertions that "murder is murder, and understanding motives and circumstances is not important" and that "life in prison without the possibility of parole is not a harsh enough penalty for murder." He agreed that "a person's upbringing influences their ability to make decisions later in life" and that he would follow the instructions given by the district court, even if he thought the law was different or if he disagreed with the instructions. In response to the prompt, "how do you feel about the death penalty?" Juror 245 responded: "I support the death penalty. I feel those who commit terrible murders and are a threat to society should be put to death." In individual voir dire, he explained further:

> **Q [Counsel for Dunlap]:** How do you determine what a terrible murder is? I mean, what kind of criteria do you use?
>
> **A [Juror 245]:** Well, see, I don't know what the State uses as their – I assume the Judge would provide us with some guidelines, and I don't know what those guidelines are.

Considering Juror 245's responses in voir dire as a whole, we cannot say that Juror 245 was substantially impaired. Juror 245's answer to defense counsel demonstrates an understanding that his duty was to render a verdict based on the facts and the law provided to him by the court.

Dunlap's constitutional rights were not violated for the district court's failure to *sua sponte* excuse Juror 245 for cause. Dunlap was not prejudiced by SAPD's failure to advance this claim on appeal.

### c.  Trial Counsel's Inadequate Voir Dire

Dunlap advances a corollary argument in support of his claim that his right to an impartial jury was violated. Dunlap argues that SAPD should have advanced a claim that trial counsel provided ineffective assistance during voir dire. Dunlap contends trial counsel was ineffective for: (1) failing to follow up on "obvious red flags in statements made by the prospective jurors;" (2) failing to move to exclude "many jurors" for cause; (3) failing to rehabilitate Juror 263; and (4) failing to oppose the State's motion to exclude Juror 263 for cause. These claims can be distilled down to two essential arguments: (1) trial counsel failed to properly question and move to strike several jurors; and (2) trial counsel failed to rehabilitate and argue on behalf of Juror 263.

Dunlap's ineffective assistance of appellate counsel claim is predicated on the underlying claim against his trial counsel. As noted above, we review claims for ineffective assistance of appellate counsel and trial counsel under the same *Strickland* standard. Because we address a claim of ineffective assistance of appellate counsel by looking to the merits of the omitted issue, if trial counsel's performance was not objectively unreasonable or did not prejudice Dunlap, then Dunlap would not be prejudiced by appellate counsel's omission of a meritless ineffective assistance of trial counsel claim. Thus, if Dunlap cannot establish a claim of ineffective assistance of trial counsel, his appellate counsel claim automatically fails. As a result, when an ineffective assistance of appellate counsel claim is based on appellate counsel's failure to raise an ineffective assistance of trial counsel claim, the appellant must first show that trial counsel was ineffective under the *Strickland* two-prong test. *See Moormann v. Ryan*, 628 F.3d 1102, 1106–07 (9th Cir. 2010); *State v. Sellers*, 858 N.W.2d 577, 585 (Neb. 2015); *Wright v. State*, 765 N.W.2d 85, 91 (Minn. 2009).

Under the *Strickland* two-prong test, the defendant must show: (1) that trial "counsel's performance was deficient;" and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Dunlap V*, 155 Idaho 345, 383, 313 P.3d 1, 39 (2013). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. This Court "will not second-guess trial counsel's strategic and tactical choices . . . and we presume trial counsel was competent and that trial tactics were based on sound legal strategy." *State v. Porter*, 130 Idaho 772, 792, 948 P.2d 127, 147 (1997).

"Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Indeed, "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *State v. Abdullah*, 158 Idaho 386, 521, 348 P.3d 1, 136 (2015) (quoting *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)); *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir. 2001) ("Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using voir dire to identify and ferret out jurors who are biased against the defense.").

"Despite its importance, the adequacy of voir dire is not easily subject to appellate review." *Rosales-Lopez*, 451 U.S. at 188. "The choice of questions to ask prospective jurors during voir dire is largely a matter of trial tactics." *Abdullah*, 158 Idaho at 521, 348 P.3d at 136 (quoting *Milton v. State*, 126 Idaho 638, 641, 888 P.2d 812, 815 (Ct. App. 1995)). "These tactical decisions made by counsel will not be second-guessed on post-conviction relief, unless made upon the basis of inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation." *Id.*; *see also State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008); *Porter*, 130 Idaho at 793, 948 P.2d at 148; *Milton*, 126 Idaho at 641, 888 P.2d at 815.

### i. Trial counsel's questioning and failure to move to strike jurors during voir dire did not constitute ineffective assistance.

Dunlap argues that trial counsel failed to follow up on "obvious red flags" in statements made by the venire and panel during voir dire, failed to move to strike several jurors, and that this led to the seating of biased jurors. Dunlap asserts that trial counsel failed to ask critical questions related to sentencing and that trial counsel wasted time asking questions which were too general or unrelated to the case. Dunlap also argues that trial counsel failed to move to exclude jurors for cause who should have been excluded and because of trial counsel's failure biased jurors were seated. Particularly, Dunlap argues there can be no tactical or strategic reason for failing to seek dismissal of a juror who would fail to take into account mitigating circumstances or who was biased in favor of the death penalty.

We turn first to the *Strickland* prejudice prong. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Prejudice exists if counsel fails to question a juror during voir dire or move to strike a juror and that juror is

found to be biased, because this evinces "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Fields v. Brown*, 503 F.3d 755, 776 (9th Cir. 2007) (en banc) (quoting *Strickland*, 466 U.S. at 694). Because Dunlap's claim of ineffective assistance of counsel is founded upon a claim that counsel failed to weed out and strike biased jurors, Dunlap must show that those jurors were actually biased against him. *See Fields*, 503 F.3d at 776; *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001) (when the defendant's claim of ineffective assistance of counsel is founded upon a claim that counsel failed to strike a biased juror, the defendant must show that the juror was actually biased against him); *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995) (citing *Smith v. Phillips*, 455 U.S. 209, 215 (1981)) ("To maintain a claim that a biased juror prejudiced him, however, [the defendant] must show that the juror was actually biased against him.").

Here, because we have concluded that Dunlap has not shown bias on the part of any juror that was seated, Dunlap's claim of ineffective assistance of trial counsel for failure to strike these jurors necessarily fails. There is not a reasonable probability that had trial counsel asked additional questions or moved to strike the seated jurors the result would have been different because the "[r]eplacement of one unbiased juror with another unbiased juror should not alter the outcome." *Fields*, 503 F.3d at 776.

Further, we find trial counsel was not deficient. We examine trial counsel's performance in voir dire by examining the objective reasonableness of their actions at the time of voir dire. *Abdullah*, 158 Idaho at 525, 348 P.3d at 140. This is because "[f]ew decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors." *Miller*, 269 F.3d at 620; *see Milton*, 126 Idaho at 641, 888 P.2d at 815. As such, we acknowledge that trial "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Mundt*, 873 N.E.2d 828, 838 (Ohio 2007) (quoting *State v. Murphy*, 747 N.E.2d 765, 794 (Ohio 2001)); *see also Hovey v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) (quoting *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980) ("The conduct of voir dire 'will in most instances involve the exercise of a judgment which should be left to competent defense counsel.' ")); *Bright v. State*, 736 S.E.2d 380, 383 (Ga. 2013). This deference carries over to trial counsel's decision whether to move to strike a juror. *See Abdullah*, 158 Idaho at 522, 348 P.3d at 137; *Miller v. Webb*, 385 F.3d 666, 673 (6th Cir. 2004) (decision to strike a juror is part of trial strategy and is not deficient

unless the strategy itself is objectively unreasonable); *State v. Adams*, 576 S.E.2d 377, 382 (N.C. App. 2003) ("[T]rial counsel are necessarily given wide latitude in matters involving strategic and tactical decisions such as which jurors to accept or strike.").

Dunlap has not shown that trial counsel's questioning or decision not to move to strike certain jurors for cause was objectively unreasonable. Dunlap's trial counsel questioned the jurors challenged in this appeal, inquiring into their views regarding capital punishment and frequently delving into the jurors' perceptions of their ability to view and weigh mitigating and aggravating circumstances. Dunlap presented no evidence that additional questioning would have revealed improper bias on the part of any juror, nor did he establish that any of the jurors were not qualified to serve. Dunlap has not shown that trial counsel's choices were the result of inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective evaluation. Thus, because Dunlap did not demonstrate a basis for claiming ineffective assistance of trial counsel, Dunlap's allegation of ineffective assistance of appellate counsel for SAPD's failure to raise this claim on appeal fails. The district court did not err by summarily dismissing this claim.

### ii. Trial counsel's strategy regarding Juror 263 did not constitute ineffective assistance of counsel.

Dunlap argues that trial counsel was ineffective for failing to rehabilitate and oppose the State's motion to strike Juror 263. In determining whether trial counsel's performance in voir dire was deficient, we note that the conduct of trial counsel is entitled to some deference because of trial counsel's opportunity to observe the prospective jurors as they answer questions. *See State v. Lindsey*, 721 N.E.2d 995, 1007 (Ohio 2000); *Johnson v. State*, 921 So. 2d 490, 504 (Fla. 2005). Trial counsel is in a much better position to determine if jurors can be rehabilitated and this decision is within the scope of acceptable practice for effective counsel. *Abdullah*, 158 Idaho at 522, 348 P.3d at 137 (citing *Lindsey*, 721 N.E.2d at 1007 ("[C]ounsel's failure to rehabilitate jurors does not render trial counsel ineffective, as counsel is in a better position to determine whether the jurors merited in-depth examination.")).

As discussed earlier, Juror 263 indicated that he would not support the death penalty if there was any evidence of any form of mental health problems. This, we conclude, was sufficient to justify removal for cause as Juror 263 indicated that his views would substantially impair his ability to perform his duties as a juror. Although trial counsel may have attempted to rehabilitate Juror 263, trial counsel's failure to do so must not be viewed through the lens of hindsight. Based

on the deference accorded to trial counsel, we are unable to conclude that trial counsel's choice not to resist the State's motion to excuse Juror 263 was objectively unreasonable.

Further, Dunlap is unable to show he was prejudiced by Juror 263's absence from the jury. While Dunlap argues that empaneled jurors were biased against him, as previously discussed, we find no basis for this claim. Although Juror 263 was removed, he was replaced by an additional impartial juror. *See Fields*, 503 F.3d at 776; *Keith v. Mitchell*, 455 F.3d 662, 677–78 (6th Cir. 2006); *Pennsylvania v. Wright*, 961 A.2d 119, 150 (Pa. 2008). Consequently, there was no prejudice to Dunlap.

Because trial counsel was not ineffective, Dunlap's claim that appellate counsel was ineffective necessarily fails. The district court's summary dismissal of this claim is affirmed.

### d. Preliminary Instruction P-3

Dunlap's final claim of error relates to Preliminary Jury Instruction P-3 (P.I. 3). P.I. 3 provided:

> Because your verdict could lead to imposition of the death penalty, your attitude toward the death penalty is a proper subject of inquiry by the court and the attorney. *The fact that you may have reservations about, or conscientious or religious objections to, capital punishment does not automatically disqualify you as a juror in a capital case. Of primary importance is whether you can subordinate your personal philosophy to your duty to abide by your oath as a jury and follow the law I give to you.* If you are willing to render a verdict that speaks the truth as you find it to exist, even though such verdict may lead to the imposition of the death penalty, you are qualified to serve as a juror in this case. *If, however, you possess such strong opinions regarding capital punishment, no matter what those opinions may be, that you would be prevented from or substantially impaired in the performance of your duties as a juror, you are not qualified to serve as a juror.*
>
> It is up to each one of you, using the standard described, to search your conscience to determine whether you are in a position to follow the law as I give it to you and render a verdict as the evidence warrants. Only by your candor can either the accused or the State of Idaho be assured of having this extremely serious case resolved by a fair and impartial jury.

At trial, Dunlap did not object to this instruction.

Dunlap argues that SAPD should have claimed on appeal that P.I. 3 violated his due process rights. Dunlap argues that P.I. 3 over-emphasized the need to exclude jurors who were inclined to render a life sentence without imposing the same requirement on jurors who were inclined to render a death sentence, and as such, is a violation of the rule announced in

*Witherspoon v. Illinois*, 391 U.S. 510 (1968). Dunlap asserts that this resulted in jurors who were substantially impaired deciding his case.

Because Dunlap did not object to this instruction below, had SAPD raised this issue on direct appeal, this Court would have reviewed the argument for fundamental error. *State v. Adamcik*, 152 Idaho 445, 472–73, 272 P.3d 417, 444–45 (2012). Thus, to prevail on appeal (and therefore to show prejudice resulting from the failure to advance this claim on appeal), Dunlap would have had the burden to prove three things: "(1) the alleged error violated an unwaived constitutional right; (2) the alleged error plainly exists and (3) the alleged error was not harmless." *Id.* (citing *State v. Perry*, 150 Idaho 209, 224, 150 P.3d 961, 976 (2010)).

"We review the trial court's jury instructions *de novo* to determine 'whether, when considered as a whole, they fairly and adequately present the issues and state the applicable law.'" *Dunlap V*, 155 Idaho 345, 364, 313 P.3d 1, 20 (2013) (quoting *Adamcik*, 152 Idaho at 472, 272 P.3d at 444). Instructions must not be judged "in artificial isolation, but must be considered in the context of the instructions as a whole . . . ." *Adamcik*, 152 Idaho at 472, 272 P.3d at 444. (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

Dunlap argues that this instruction does not adequately represent the applicable law regarding removal of jurors based on the juror's scruples against capital punishment under *Morgan* and *Witherspoon*. *Witherspoon* provides that a death sentence cannot be carried out if the jury was chosen "by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at 522; *see Wainwright v. Witt*, 469 U.S. 412 (1985). Thus, the statement in the instruction that the fact that a juror "may have reservations about, or conscientious or religious objections to, capital punishment does not automatically disqualify you as a juror" is consistent with *Witherspoon*.

Dunlap argues, however, that the instruction is one sided because it does not indicate that those who are biased *toward* the imposition of the death penalty must also "subordinate" their personal philosophy. It is true that the focus is on those who may have objections to capital punishment and not those who may overtly favor its use. Yet, in this case, P.I. 3 goes on to say: "If, however, you possess such strong opinions regarding capital punishment, *no matter what those opinions may be*, that you would be prevented from or substantially impaired in the performance of your duties as a juror, you are not qualified to serve as a juror." This is an

accurate statement of the law: "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). Further, "the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes." *Id.* Finally, "a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible." *Id.* Thus, read as a whole, P.I. 3 properly indicates that regardless of the juror's opinions, should those opinions prevent or substantially impair their performance, an individual is not qualified to serve as a juror.

Because Dunlap's challenge to P.I. 3 fails on its merits, Dunlap has failed to show that SAPD provided ineffective assistance of appellate counsel for failing to raise this claim on appeal. The district court properly granted the State's motion for summary dismissal of this claim.

### III. CONCLUSION

We conclude that the district court properly dismissed all of Dunlap's substantive post-conviction claims because the requirements of Idaho Code section 19-2719 were not met. We also conclude that the district court properly granted summary dismissal as to each of Dunlap's claims for ineffective assistance of appellate counsel. For these reasons, we affirm the district court's dismissal of Dunlap's Successive Petition for Post-Conviction Relief. Costs to Respondent.

Chief Justice J. JONES and Justices EISMANN, BURDICK and W. JONES **CONCUR**.